NEW JERSEY ASSOCIATION ON CORRECTION, A NEW JER-
SEY NOT-FOR-PROFIT CORPORATION, PLAINTIFF-RE-
SPONDENT, v. DONALD T. LAN, SECRETARY OF STATE
OF THE STATE OF NEW JERSEY, DEFENDANT-AP-
PELLANT.

Argued March 19, 1979—Decision Rendered April 2, 1979—
Opinion Filed June 8, 1979.

## ORDER

It appearing that the issues involved in this matter are of public importance and that an early announcement of the Court's judgment would be in the public interest, and it being the unanimous determination of the Court that the Institutional Construction Bond Act of 1978 (L. 1978, c. 79) is constitutional;

It is hereby ORDERED that the judgment of the Appellate Division is reversed, and the judgment of the trial court is reinstated. A full opinion in this matter will be filed in due course.

*Mr. John J. Degnan,* Attorney General of New Jersey, argued the cause for appellant (*Mr. Degnan,* attorney; *Mr. Michael R. Cole,* Assistant Attorney General, of counsel; *Mr. Cole* and *Ms. Charlotte Kitler,* Deputy Attorney General, on the brief).

*Mr. Thornton G. Edwards,* a member of the New York bar, argued the cause for *amicus curiae* New Jersey Associa-

tion of Retarded Citizens, Inc. (*Messrs. Wilentz, Goldman* and *Spitzer*, attorneys).

*Mr. Steven H. Gifis* argued the cause for respondent.

The opinion of the court was delivered by

HUGHES, C. J. This issue comes before the Court on appeal by the State, as of right, *R.* 2:2–1(a)(1). The case originated in the adoption of *L.* 1978, c. 79, which was labeled the "Institutional Construction Bond Act of 1978" (hereafter "Act" or "statute") and which projected a bond issue of $100 million to provide construction of or improvement to various public buildings for purposes described in the statute. Conformably to the Constitution, which inhibits the creation of such State debt absent approval by the people, *N. J. Const.* (1947), Art. VIII, § II, par. 3, the statute provided for submission of the following question and Interpretive Statement to the electorate in the then forthcoming general election:

INSTITUTIONAL CONSTRUCTION BOND ISSUE

Should the "Institutional Construction Bond Act of 1978" which authorizes the State to issue bonds in the amount of $100,000,000.00 for construction and improvement of facilities serving the mentally retarded and mentally ill; for construction of correctional institutions including Trenton State Prison; and for the acquisition and construction of facilities, including facilities to serve blind and handicapped persons and a forensic laboratory for the State Medical Examiner; and to provide means to pay the principal and interest on these bonds, be approved?

INTERPRETIVE STATEMENT

Approval of this act will authorize sale of $100,000,000.00 in bonds to be used (1) to provide facilities for the mentally retarded and mentally ill which will improve the quality of care and allow the State to receive partial Federal reimbursement for such services; (2) for construction and improvement of correctional facilities to provide safe and humane conditions; (3) to offer library services to the blind and handicapped; and (4) to provide for a forensic laboratory for the State Medical Examiner.

The statute was challenged shortly after its adoption in an action filed under the Declaratory Judgments Act (*N. J. S. A.* 2A:16–50 *et seq.*) and the trial court upheld its constitutional validity in judgment rendered on October 18, 1978. The plaintiff in that action was the New Jersey Association on Correction (hereafter "Association"); formerly known as the Morrow Association, and a foremost and distinguished proponent of correctional reform. It promptly appealed the issue to the Appellate Division, where the matter was pending when the electorate approved the bond issue at the election of November 7, 1978. Thereafter the Appellate Division, on December 1, 1978, reversed the trial court, holding the underlying statute, and the bond issue it proposed, to be in conflict with the Constitution of New Jersey. The State appealed, and for reasons to be delineated herein, we were and are of the opinion that the Appellate Division was in error and that the statute and its authorized bond issue were indeed in compliance with that Constitution. Because of the urgent public question involved, we so declared by our Order entered herein on April 2, 1979, subject to amplification by this opinion.

The Association had originally argued a deficiency in the title of the Act based on conceptual or semantic differences between "public buildings" (as in the title) and "institutions" (as in the body) of the Act. It thought this appeared to offend *N. J. Const.* (1947), Art. IV, § VII, par. 4, that "* * * every law shall embrace but one object, and that shall be expressed in the title." This "title" contention was overruled by the trial court, was not addressed by the Appellate Division and the Association does not present it to this Court for consideration. Rather the not dissimilar gravamen of the Association's case implicated the "one object" factor of Art. IV, § VII, par. 4 and another constitutional mandate of like import which reads:

The Legislature shall not * * * create * * * a debt or debts * * * unless the same shall be authorized by a law for some single object

or work distinctly specified therein. * * * No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon. * * * [*N. J. Const.* (1947), Art. VIII, § II, par. 3].

The body of the Act illuminated the specific uses of the buildings contemplated as follows:

Bonds of the State of New Jersey in the sum of $100,000,000.00 are hereby authorized for the construction and acquisition of public building and institutions as defined herein. Of such total the proceeds from the sale of bonds shall be allocated, to the maximum extent practicable and feasible, according to the following estimates of cost:

a. The construction of public buildings for the mentally retarded in conjunction with the Federal Program for Intermediate Care Facilities/Mentally Retarded — $51,000,000.00; and for improvements and additions to facilities for the mentally ill — $8,000,000.00 to be implemented by the Department of Human Services.

b. The construction of institutions for the incarcerated, including the completion of the reconstruction of Trenton State Prison, to be implemented by the Department of Corrections — $30,000,000.00.

c. Construction of public buildings for records and for library facilities for blind and handicapped persons, to be implemented by the Department of Education—$6,500,000.00.

d. Construction of a forensic science facility for the activities of the State Medical Examiner to be implemented by the Department of Law and Public Safety—$4,500,000.00 [*L.* 1978, *c.* 79, § 5].

And as stated by the Appellate Division, these purposes were linked in that

[a]ll of these building projects were legislatively found to be "critically" and "immediately" needed to carry out public responsibilities to the people of this State (*L.* 1978, *c.* 79, § 2). All were recommended by the Commission on Capital Budgeting and Planning; all were designed to serve the administrative and institutional needs of State Government. [164 *N. J. Super.* at 119–20].

The question presented, then, is whether these different projects constituted a single object in the intendment of the Constitution. The Association asserts that

[t]he unconstitutionality of *L.* 1978, *c.* 79, can be found * * * in the inclusion in one enactment of several objects to be served by the issuance of the bonds authorized by this enactment[ ;] that these purposes are essentially unrelated to each other, or related only at a prohibited level of abstraction, and are each to be administered by different departments of the Executive Branch [ ; that] their inclusion within one enactment requiring voter approval for its effectiveness violates the express constitutional mandate designed, in part, to enable independent voter appraisal of each purpose for which bonds were to be issued. [164 *N. J. Super.* at 120–21].

The argument of the State was perceived by the Appellate Division as follows:

The State's response to this argument is, as stated in its brief, that "[w]hile the bond proceeds may be allocated to several construction projects, serving different societal needs, and administered by different departments of State Government, all share the common characteristic of being public facilities, operated for the public good." Although each proposed facility would serve different functions, each would, nonetheless, "be operated as public buildings used for providing services for the public's good." The different projects are all related to, and in furtherance of, that general purpose, thereby satisfying the test of compliance with the state constitutional standard. [164 *N. J. Super.* at 121].

■ As applicable to both constitutional "object" provisions, we agree with the Appellate Division's synthesis of the issue:

Both parties properly identify the standard by which compliance with the single object rule will be measured, the relatedness *vel non* of the various matters embraced within one enactment. As observed in *Newark v. Mount Pleasant Cemetery Co.*, 58 *N. J. L.* 168, [171] (E. & A. 1895) :

> The evil intended to be guarded against [by the single object rule] was not the inclusion in one act of more than a single matter, but the inclusion therein of matters not properly related among themselves. So by its obvious construction this constitutional provision justifies and permits legislation by one statute, looking toward a single general object, although it contains and enacts various and multiform matters, if those matters are properly related to each other and tend to effectuate the general object.

[164 *N. J. Super.* at 121].

In further refinement of the issue, we discard at once the notion that any relevance attaches to the fact that the construction projects enumerated in section 5 of the Act, *supra,* were to be implemented by different departments of the Executive Branch of government. If one were dealing, for instance, with educational instruction of prisoners, it would plainly be appropriate and certainly not disparate in concept for responsibilities therefor to be shared between the Department of Corrections (primarily responsible for custody) and the Department of Education (essentially involved with instruction). *Cf. N. J. S. A.* 30:4AA–1.

The New Jersey Constitution provides for the organization of the Executive Branch of State government into not more than 20 principal departments, all intended to have the operational flexibility needed to assist the Governor in his primary obligation to "take care that the laws be faithfully executed." *N. J. Const.* (1947), Art. V, § I, par. 11; Art. V, § IV, par. 1. This flexibility extends to the statutory creation of new departments, conferring upon them functions previously exercised by others (*e.g.,* Department of the Public Advocate, *N. J. S. A.* 52:27E–1 *et seq.;* Department of Community Affairs, *N. J. S. A.* 52:27D–1 *et seq.*). It accommodates as well the separation of departments (*e. g.,* the former Department of Institutions and Agencies, *L.* 1918, *c.* 147, and its transposition into the Department of Corrections, *N. J. S. A.* 30:1B–1 *et seq.,* and the Department of Human Services, *N. J. S. A.* 30:1A–1 *et seq.;* the former Department of Education, *L.* 1945, *c.* 51, into the new Departments of Education, *N. J. S. A.* 18A:3–1 *et seq.,* and of Higher Education, *N. J. S. A.* 18A:4–1 *et seq.;* the former Department of Banking and Insurance, *L.* 1891, *c.* 6, and its separation into a Department of Insurance, *N. J. S. A.* 17:1C–1 *et seq.,* and a Department of Banking, *N. J. S. A.* 17:1B–1 *et seq.*). This flexibility is for the convenient and efficient operation of State government and was clearly intended by the people in their adoption of the 1947 Constitution.

Even the constitutional doctrine of separation of powers of the branches of government, as pointed out by Chief Justice Vanderbilt in *Massett Building Co. v. Bennett*, 4 *N. J.* 53, 57 (1950), "has nowhere been construed as creating three mutually exclusive watertight compartments. To do so would render government unworkable * * *." *A fortiori* the singularity or relatedness of purposes here involved are unaffected by their fulfillment by different Executive departments.

The surviving "relatedness" requirement has at least a two-fold significance. The first involves information adequate to so advise the voter as to enable "an understanding appraisement of the project." *Behnke v. New Jersey Highway Auth.*, 13 *N. J.* 14, 32 (1953). In *Behnke, supra,* this Court, in construing the reach and purpose of the constitutional provision, said:

The design of this constitutional limitation is the confinement of the debt or liability to a "single object or work." The money thus provided cannot be expended for one purpose under the guise of another. This for the protection of the State's revenue and credit *as well as for an understanding appraisement of the project by the electorate*. [*Id.* at 32 (emphasis supplied)].

Considering the question and Interpretive Statement on the ballot as to this bond issue, *supra,* one would wonder how any literate voter could be misled or fail to have "an understanding appraisement of the project" here involved. The information could hardly have been more specific. We are not dealing here with an announced simple purpose of the erection of "buildings" or "needed public buildings" as the Appellate Division seems to have understood the State's contention. This view led that court to comment "[w]e cannot regard the construction of a building, or buildings, without advice concerning the use to which the building will be put, as an appropriate legislative object," and that "[l]egislation does not ordinarily provide for the erection of a building without some description of the purpose to which

it is to be put." 164 *N. J. Super.* at 124–25. That, of course, has no relationship to the present case, where the intended uses of the buildings were fully described to the voters and could not possibly have been misunderstood as accommodating a public zoo, hockey or gambling activity or other discordant examples mentioned. *Id.* at 125. This even though these latter items might broadly come within the State's somewhat understated formula of commonality in its brief— "public buildings used for providing services for the public's good." *Id.* at 121.

Still less could one consider as apposite the Appellate Division's reliance on *Schnoerr v. Miller,* 4 *Ohio App.* 2d 99, 212 *N. E.* 2d 671 (App. Ct. 1963), *aff'd,* 2 *Ohio St.* 2d 121, 206 *N. E.* 2d 902 (1965), where only a public building was specified in the crucial bond question, whereas the specific purpose, as generally known in the small community, was the construction of a public bomb shelter. Such vague description was held defective in failing to identify the "one purpose" of a municipal bond issue as required under Ohio law.

The Appellate Division accurately perceived the second purpose of the constitutional restriction as designed to prevent

* * * the pernicious legislative practice commonly known as "logrolling" whereby a weak or unpopular measure is coupled with an unrelated popular one in order to facilitate its passage. If permitted, the practice confronts the voter, be he legislator or citizen, with a difficult and unfair choice; he must either forfeit the benefits of the desired legislation in order to vote his conscience on the measure he rejects, or he must accept the provision to which he has objection in order to obtain the benefits of the measure he favors. Independent appraisal of each measure, on its own merits, is frustrated and no one can be certain as to whether each of such improvidently combined provisions would have obtained voter approval had it been presented to the voter on an independent basis. When, however, the single object rule is complied with, the voter is enabled to voice his reaction to the merits of the provision submitted. [164 *N. J. Super.* at 122].

This represents the primary target of the Association's attack, namely the inclusion of "construction of institutions

for the incarcerated, including the completion of the reconstruction of Trenton State Prison * * *," *L.* 1978, *c.* 79, § 5, with other purposes of institutional construction. It identifies this as the central issue in the case. Disillusioned with the bruited failure of rehabilitation in the prisons and consequent high rates of recidivism, it seeks a pause in prison construction, so that they will house only the most violent and dangerous of prisoners, looking to other means of community treatment and rehabilitation which, whether *in esse* or not, need not be discussed in detail here. This is a valid question, of wide national currency and dispute.[1] The Association argues that in the face of such objection the prison construction should not be included with the other purposes and, if it were, the Association (however empathetic it might be to those other purposes) would be constrained to oppose the whole bond issue. It projected this argument in many forums, including the Commission on Capital Budgeting and Planning, the Legislature, the people in the general election, the trial court, the Appellate Division, and finally before this Court. It was successful only in the Appellate Division.

---

[1] Dr. James Q. Wilson, professor of government at Harvard University, and author of "Thinking About Crime," is a strong supporter of increased construction. His view: "Since society clearly wishes its criminal laws more effectively enforced, and since this means rising prison populations, perhaps for a long period, the effect of failing to expand capacities would be to continue to perpetuate the conditions of overcrowding * * *."

William G. Nagel, director of the Institute of Corrections of the American Foundation, argues strongly against that course: "Building prisons is like the government trying to hold back the wind with its hands." * * *

Perhaps never before in U. S. history has there been a wider range of opinion on questions concerning incarceration * * *. [*Corrections Magazine* 2 (March 1977)].

Should We Build More Prisons?, A Debate between John P. Conrad, Senior Fellow, Center on Crime and Justice, The Academy for Contemporary Problems [pro], Milton G. Rector, President, National Council on Crime and Delinquency [con], National Council on Crime and Delinquency (1977).

On the other hand, the Legislature was aware of the desperate need for prison improvement in New Jersey. The physical deficiencies of the aged State Prison at Trenton have been notorious and condemned for a half century, as noticed by this Court in *Avant v. Clifford,* 67 *N. J.* 496, 559 (1975).

It is the intensity of clash between these philosophic viewpoints that impels the Association to argue that combining this construction with other projects constituted the "improvidently combined provisions" referred to by the Appellate Division in condemning the Act. 164 *N. J. Super.* at 122. Yet it may be easily imagined that mental health advocates might as strongly urge the elimination of many traditional mental institutions in favor of theoretical community facilities and thus oppose and seek separate consideration of that segment of the bond issue proposed by the Act—even if State facilities for the care of these unfortunates fell into or continued in a condition of dilapidation in the meanwhile. Other groups might feel as strongly that the State is already expending enough on facilities for the blind and handicapped, and so on.

But these questions, however one may view their merits, are for the Legislature and the people to decide, subject only to constitutional bounds. For, as frequently noted by this Court, the prudence, wisdom, good sense or otherwise of the legislative action are not for the Court, if it is only within the Constitution. *White v. North Bergen,* 77 *N. J.* 538, 554–55 (1978); *Vornado, Inc. v. Hyland,* 77 *N. J.* 347, 354–55 (1978); *Hutton Park Gardens v. West Orange,* 68 *N. J.* 543, 564–65 (1975); *Brown v. Heymann,* 62 *N. J.* 1, 10–11 (1972); *Burton v. Sills,* 53 *N. J.* 86, 95 (1968); *Thomas v. Kingsley,* 43 *N. J.* 524, 530 (1965); *The Grand Union Co. v. Sills,* 43 *N. J.* 390, 403 (1964); *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199, 229 (1960).

## THE "RELATEDNESS" IN PURPOSE OF THE ACT

The Appellate Division recognized that appropriate compliance with the single object rule will not obviate difficult voter choices, for example as among the purpose of a debt, the means to accomplish the purpose, and its cost. And this is obviously and practically so. A comprehensive highway development bond issue covering all counties in the State might face a strong and universal public reaction that County "X," highly favored in past years, should not participate. Or a conservation bond issue, it might be thought, should confine itself to the wetlands, rather than include the forests, and so on. Yet this difficulty of choice would project no constitutional infirmity, given the general object of the Act and that such diverse effects were germane to it. The constitutional purpose is to protect against the extreme, the "pernicious," the incongruous, *Johnson v. Harrison,* 47 *Minn.* 475, 50 *N. W.* 923, 924 (Sup. Ct. 1894) ; *Newark v. Mount Pleasant Cemetery Co.,* 58 *N. J. L.* 168, 171 (E. & A. 1895) ; the manifestly repugnant, *Behnke, supra,* 13 *N. J.* at 25; the palpable contravention of the constitutional command, *Jersey City v. Martin,* 126 *N. J. L.* 353, 363 (E. & A. 1941) ; *Public Serv. Elec. & Gas Co. v. Camden,* 118 *N. J. L.* 245, 250 (Sup. Ct. 1937) ; fraud or overreaching or misleading of the people, *Howard Sav. Inst. v. Kielb,* 38 *N. J.* 186, 201 (1976) ; the inadvertent, *Gellert v. State,* 522 *P.* 2d 1120, 1122 (Alaska Sup. Ct. 1974) ; the "discordant," *Schwab v. Ariyoshi,* 58 *Haw.* 25, 564 *P.* 2d 135, 140 (1977) ; or "the intermixing in one and the same act [of] such things as have no proper relation to each other," *Grover v. Trustees of Ocean Grove Camp-Meeting Association,* 45 *N. J. L.* 399, 402 (Sup. Ct. 1833) ; or matters which are "uncertain, misleading or deceptive," *State v. Czarnicki,* 124 *N. J. L.* 43, 45 (Sup. Ct. 1940).

In measuring the "relatedness" concept against the background of such extremes, we note that the course of judicial and constitutional history in New Jersey has been

to invoke a broad rather than a strict or hyper-technical approach. As for specific constitutional adjurations such as involved herein, the judicial policy has been to construe them liberally with a design not to "embarrass" legislative enactments by an interpretation "whose strictness is unnecessary to the accomplishment of the beneficial purposes" of the constitutional provision, *Bergen County Sav. Bank v. Township of Union*, 44 *N. J. L.* 599, 602 (Sup. Ct. 1882); hypercritical analysis being "utterly out of place * * *." *Public Serv. Elec. & Gas Co. v. Camden, supra*, 118 *N. J. L.* at 251; see *Howard Sav. Inst. v. Kielb, supra*, 38 *N. J.* at 201. This in deference to the legislative will and that of the people, so that government and its progress in service to the people would not be hamstrung. *See Bergen County Sav. Bank v. Township of Union, supra*, 44 *N. J. L.* at 603; *Albright v. Sussex County Lake & Park Comm'n*, 68 *N. J. L.* 523, 527–28 (Sup. Ct. 1902); *State ex rel. Test v. Steinwedel*, 203 *Ind.* 457, 180 *N. E.* 865, 868 (1932); *Board of County Comm'rs v. White*, 79 *Wyo.* 420, 335 *P.* 2d 433, 441 (1959).

In that regard we do not view as irrelevant, as did the court below, the course of legislative practice utilized in presenting bond issue questions to the people. This historical method, even though unchallenged by litigation, is not without significance, particularly where the practice antedated the 1947 Constitution, which incorporated verbatim the "single object" provisions of the 1844 Constitution.[2] One

---

[2]The acceptance by the 1947 Constitutional Convention of the 1844 language, in the light of existing legislative practice and popular understanding, was no doubt influenced by the sensible testimony before it of State Treasurer Hendrickson:

I have tried to indicate that the tax and finance section of any constitution, like a constitution itself, should be simple and to the point. It should not attempt to legislate. If we seek to impose all sorts of restrictive provisions on our Legislatures, we will one day soon find them utterly lacking the power to deal effectively and courageously with some of the pressing problems which lie ahead. * * * We must learn to recognize our legislators as men of integrity, even though we know that some Legislature will always

may particularly notice a bond issue presented to and approved by the people in 1930, *L.* 1930, *c.* 227, in which the projected uses for the bond yield were "* * * the construction, reconstruction, development, extension and equipment of State charitable, hospital, relief, training, correctional, reformatory and penal institutions and the appurtenances thereto * * *." *Id.* § 1; *see also L.* 1921, *c.* 201.

■■ And in the intervening decades many other bond issue questions have been presented to the people—some approved, some rejected, but few exceeding the specificity and "relatedness" of purposes of the present Act.[3] The grouping of related projects in one statute, therefore, has become an established pattern, one apparently compatible with popular understanding and will, and legislative acceptance. We do not agree that this represents a "[l]ong-term adherence to

---

have its quota of misfits. On the whole, our Legislatures down through history have been regularly composed of considerable numbers of men who have unselfishly served their State capably and well, and this Convention should continue its deliberations upon that assumption and premise. [V· Constitutional Convention of 1947 at 602 (Proceedings Before the Committee on Taxation and Finance, July 8, 1947)].

[3] *L.* 1948, *c.* 409, § 1 would have provided funds for "State buildings, equipment and facilities for charitable, hospital, relief, training, correctional, reformatory * * * penal requirements and for higher education" (rejected by the voters); *L.* 1949, *c.* 3; *L.* 1952, *c.* 3; *L.* 1961, *c.* 73; *L.* 1964, *c.* 144 all providing funds for "State mental, charitable, hospital, relief, training, correctional, reformatory and penal institutional buildings" (all approved by the voters); *L.* 1963, *c.* 75, § 4 would have provided funds for "mental, charitable, hospital, training and correctional buildings[,] buildings required for the operation of community colleges[,] local school districts, and State Institutions of Higher Education" (rejected by the voters); *L.* 1968, *c.* 128, § 3(a) providing funds for "buildings, structures and facilities * * * for mental, charitable, hospital, training and correctional purposes[,] for the operation of a State-wide public television and radio network[,] for the operation of vocational education programs [and] for State institutions of higher education and county colleges" (approved by the voters); *L.* 1976, *c.* 93, § 3(a) providing funds for "mental, charitable, hospital, training and correctional purposes" (approved by the voters).

an impermissible mode of legislation," 164 *N. J. Super.* at 126, but rather is entitled to weight in analysis of the manner of application of the constitutional command. "Like all precedents, where contemporaneous and practical interpretation has stood unchallenged for a considerable length of time it will be regarded as of great importance in arriving at the proper construction of a statute." 2A Sutherland, *Statutes & Statutory Construction* § 49.07, 251–52 (4th ed. 1973). *See State v. Clark,* 15 *N. J.* 334, 340–41 (1954); *Commonwealth Roofing Co. v. Riccio,* 81 *N. J. Eq.* 486, 488–89 (E. & A. 1913); *Francis v. Southern Pacific Co.,* 333 *U. S.* 445, 450, 68 *S. Ct.* 611, 613–14, 92 *L. Ed.* 798, 804 (1948); *Fleming v. Mohawk Wrecking & Lumber Co.,* 331 *U. S.* 111, 116, 67 *S. Ct.* 1129, 1132, 91 *L. Ed.* 1375, 1382 (1947); *United States v. State Bank of North Carolina,* 31 *U. S.* (6 *Pet.*) 29, 39–40, 8 *L. Ed.* 308, 312 (1832). This doctrine "has such prevalence that it is applicable not only in the exposition of statutes, but in the interpretation of constitutions of governments." *In re Hudson County,* 106 *N. J. L.* 62, 75 (E. & A. 1928).

■ The spirit of breadth, tolerance and flexibility in application of a constitutional mandate such as here involved is well stated in the early case of *Johnson v. Harrison, supra*:

* * * All that is required is that the act should not include legislation so incongruous that it could not, by any fair intendment, be considered germane to one general subject. The subject may be as comprehensive as the legislature chooses to make it, provided it constitutes, in the constitutional sense, a single subject, and not several. The connection or relationship of several matters, such as will render them germane to one subject and to each other, can be of various kinds, as, for example, of means to ends, of different subdivisions of the same subject, or that all are designed for the same purpose, or that both are designated by the same term. Neither is it necessary that the connection or relationship should be logical; it is enough that the matters are connected with and related to a single subject, in popular signification. [50 *N. W.* at 924].

We thus consider whether "by any fair intendment" the purposes to be served by the present bond issue are, as contended by the Association, "essentially unrelated to each other, or related only at a prohibited level of abstraction," a proposition accepted by the court below. That court thought them "unrelated measures," "disparate objects or works," "improvidently combined provisions," leaving only as "the proffered basis for relating the several purposes of this enactment * * * the fact that 'buildings' will be constructed from the proceeds of the bonds." This conclusion led to its emphatic and unconditional finding of manifest and fatal repugnance to the Constitution. 164 *N. J. Super.* at 127.

We disagree. We perceive a sure "relatedness" among the institutional construction of the buildings, the purposes such institutions are to serve, and the identity of those who will be served thereby (primarily those who in custody or other circumstances are linked together by their need for State care, protection and rehabilitation[4]), providing, from the practical and sensible standpoint recommended by our precedents the requisite germaneness *inter se,* all in fulfillment of the general object of the law.

Regrettably, a large segment of our citizenry must, as in every jurisdiction, be incarcerated, not only for punishment for crime but for incapacitation, for the protection of the peaceful community—for the "domestic tranquility" envisaged by our forebears. Yet under the Eighth Amendment to the Constitution of the United States, these prisoners may not be subjected to cruel and unusual punishment, a prospect to

---

[4]There are no ironclad divisions among our institutionalized citizens. Persons within the penal system may qualify for services for the mentally infirm or handicapped. Persons suffering from mental illness or retardation or other handicaps frequently move through the penal system. Blind and handicapped people may have mental problems calling for the attention of other governmental services. The Medical Examiner in no sense is divorced from these concerns since his office serves the institutionalized population as well as the general citizenry.

be almost certainly anticipated absent the effectuation of one of the purposes of the bond issue. Again, no decent state or its people will confine its mentally disabled or retarded citizens in a dilapidated physical plant, or subject these unfortunate fellow humans to more hardships than they already suffer from an unhappy fate. By the same token, neither Legislature nor the people would deny to the sightless and handicapped the library facilities to be provided by the issue. The State purpose in this direction was long ago decided when it created our Commission for the Blind and Visually Handicapped, *N. J. S. A.* 30:6-1 *et seq.,* and has been confirmed in other ways, including among them the approval of the instant bond issue by the people in the general election of 1978. Nor is the smallest remnant of the bond issue, for the construction of a forensic science laboratory for the activities of the State Medical Examiner (*N. J. S. A.* 52:17B-78 *et seq.*), disassociated with the well-being and protection of many in our population, as testified to before the legislative committee by the Examiner, Dr. Edwin Albano, *inter alia,* as follows:

Now, the lack of space discourages many areas of possible research in the etiology — the cause — and solution of epidemiological factors — that is the ecology — associated with disease and sudden death, such as crib death, even cancer deaths * * *. [Public Hearing, Assembly Institutions, Health and Welfare Committee, June 22, 1978, at 2-3].

The interconnection of the Medical Examiner's responsibilities and the institutional, as well as the general, population is evident, *e. g.,* his statutory duty to investigate deaths of prisoners or others in the institutions to be assisted by this bond issue. *N. J. S. A.* 52:17B-86 e, f.

We see in all the foregoing purposes and the substantial segments of our population to be served thereby, and in the beneficent State resolve and commitment to them (the meeting of "public responsibilities to the people of this State," 164 *N. J. Super.* at 119), a "relatedness" fully meeting the

constitutional norm. That being so there appears to us no constitutional imperative to strike down the determination of the Legislature and the expressed will of the people.

## JUDICIAL RESTRAINT

But even if we entertained a doubt of constitutionality (which we do not), we would be equally bound, by judicial precedents since the earliest days of our nation, to eschew judicial interference with the legislative will. Chief Justice John Marshall indeed counseled the courts to avoid, where at all possible, confrontation with constitutional issues. Sitting at circuit in *Ex parte Randolph,* 20 *F. Cas.* 242, 254 (C. C. D. Va. 1833) (No. 11,558), he stated:

No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.

But where, as here, the constitutional issue must be dealt with, every reasonable intendment runs in favor of constitutionality. *Jamouneau v. Harner,* 16 *N. J.* 500, 515 (1954). This because of seemly respect for the act of a co-equal branch of government, as well as for the public interest in the effective operations of government—both elements invoking a "broad tolerance" in considering a charge of constitutional evasion or excess. *Bulman v. McCrane,* 64 *N. J.* 105, 113 (1973). *Cf. Clayton v. Kervick,* 52 *N. J.* 138 (1968).

In *New Jersey Sports & Exposition Auth. v. McCrane,* 119 *N. J. Super.* 457 (Law Div. 1971), *aff'd,* 61 *N. J.* 1, *appeal dismissed,* 409 *U. S.* 943, 93 *S. Ct.* 270, 34 *L. Ed.* 2d 215 (1972), Justice (then Judge) Pashman emphasized the required judicial circumspection vis-a-vis an act of the Legislature, pointing out that such an enactment is

\* \* \* entitled to great weight by the courts. It should not be set aside unless there is no reasonable basis for sustaining it.

The cardinal principle of statutory construction must be to save and not to destroy. The duty of the court is to strain if necessary to save the act, not to nullify it.

It must be remembered that the greatest danger to people from the exercise of the judicial power is that there may be a usurpation by the courts of the people's right to express in law, by overwhelming numbers of their elected legislators, their collective reasoning. Rights are fragile. \* \* \* [119 *N. J. Super.* at 476–77].

In affirming that decision, Justice Francis stated for this Court:

One of the most delicate tasks a court has to perform is to adjudicate the constitutionality of a statute. In our tripartite form of government that high prerogative has always been exercised with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives. As a result, judicial decisions from the time of Chief Justice Marshall reveal an unswerving acceptance of the principle that every possible presumption favors the validity of an act of the Legislature. As we noted in *Roe v. Kervick*, 42 *N. J.* 191, 229 (1964), all the relevant New Jersey cases display faithful judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised by the Legislature to serve a public purpose conform to the Constitution. And these cases project into the forefront of any judicial study of an attack upon a duly enacted statute both the strong presumption of validity and our solemn duty to resolve reasonably conflicting doubts in favor of conformity to our organic charter. [*New Jersey Sports & Exposition Auth. v. McCrane, supra,* 61 *N. J.* at 8].

So it is, for the most sensible and urgent of reasons that

[w]ithin the limits necessary to the preservation of our tripartite form of state government, and the basic principle on which it rests, the debt clause of the Constitution must be construed \* \* \* to the end that public progress and development will not be stifled and that public problems with their ever increasing complexity may be met and solved. [*Id.* at 30].

In the earlier case mentioned, *Roe v. Kervick*, 42 *N. J.* 191 (1964), in reviewing many decisions in this and other

jurisdictions, noting the obligation of legislators to meet new challenges, Justice Francis had written:

> The cases referred to are not identical with our issue but they are sufficiently analogous and persuasive to demonstrate the modern tendency of legislatures to meet challenges presented by pressing socio-economic needs of our times. They re-emphasize also the long-established principle of judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised to meet the public need conform to the Constitution. And they project into the foreground of judicial study of attacks thereon, the equally-settled doctrine that the means are presumptively valid, and that reasonably conflicting doubts should be resolved in favor of validity. [*Id.* at 229].

The mutuality of respect among the branches of government so recommended is rooted in our constitutional scheme. It has a vital relationship to the practical working of government as well as to the ideal of the system by which the people have chosen to be governed. As stated by Justice Oliver Wendell Holmes in *Missouri, Kan. & Tex. Ry. Co. v. May,* 194 *U. S.* 267, 270, 24 *S. Ct.* 638, 639, 48 *L. Ed.* 971, 973 (1904), we are to be mindful that

> [g]reat constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.

The divergence of our views from those of the Appellate Division, as to the *factum* of "relatedness," evidences that "reasonable men might differ" on the issues, invoking "judicial deference to the will of the lawmakers." *New Jersey Sports & Exposition Auth., supra.* Hence, we are quite clear in our decision to uphold the constitutionality of the Act and the bond issue which it authorized.

Reversed.

*For reversal*—Chief Justice HUGHES and Justices MOUNTAIN, JACOBS, PASHMAN, CLIFFORD, SCHREIBER and HANDLER —7.

*For affirmance*—None.