231 N.J. Super. 180 (1988)
554 A.2d 1381
DELTA CHEMICAL CORPORATION, PLAINTIFF,
v.
OCEAN COUNTY UTILITIES AUTHORITY AND ALLIED COLLOIDS, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided December 22, 1988.
*182 Richard A. Grossman and Thomas J. Heavey, for plaintiff (Grossman & Kruttschnitt, attorneys).
Richard H. Woods, for defendant Ocean County Utilities Authority (Hiering, Dupignac & Barnes, attorneys).
Arnold R. Kent, for defendant Allied Colloids.
SERPENTELLI, A.J.S.C.
More than a half century after the enactment of the so-called "Buy American" requirement now contained in the Local Public Contracts Law [N.J.S.A. 40A:11-18], the court is asked to determine the constitutionality of that provision. It is a case of first impression since the only other definitive challenge to the Buy American concept in New Jersey was within the context of state purchases made pursuant to N.J.S.A. 52:33-2 and 3. As will be discussed, those statutes have language distinguishing them from N.J.S.A. 40A:11-18.
The Ocean County Utilities Authority (hereinafter OCUA) solicited bids for the acquisition of polymers to be utilized in its three pollution control facilities. Separate bids were sought for the northern, central and southern water pollution control plants. The instructions to bidders for all three contracts contained the following language:
Preference for Domestic Products
Only manufactured products of the United States, wherever available, shall be used in connection with this contract, pursuant to 40A:11-18 of the Revised Statutes of the State of New Jersey.
Six bids were received. Pursuant to the specifications, tests were performed on the polymers to evaluate their efficiency. The lowest responsible bidder was to be determined not only by *183 price per pound, but also by treatment efficiency. The ultimate determinant of the lowest responsible bidder was the cost of the polymer per dry ton. A summary of the bids of plaintiff, Delta, and defendant, Allied, for the three facilities follows:

 1) NORTHERN PLANT:
 ALLIED: $20.43
 DELTA: 23.05
 2) CENTRAL PLANT:
 ALLIED: $22.95
 DELTA: 38.91
 3) SOUTHERN PLANT:
 ALLIED: $16.37
 DELTA: 40.40

Allied was the lowest bidder at all three plants. Delta was the third lowest bidder at the northern and central plants and the highest bidder at the southern plant. Based on estimated usage, the OCUA calculated Delta's total bids at almost $238,000 and Allied's total bid at $157,000. A gross savings of approximately $81,000 would be realized by awarding all three contracts to Allied. The OCUA adopted a resolution awarding the contract for all three facilities to Allied. It is stipulated that Delta intended to provide products manufactured in the United States. Allied and other bidders intended to supply products manufactured outside of the United States.
Delta contends that it is entitled to an award of the contract for all three facilities because it was the only bidder providing an American made product. Alternatively it asserts that it is entitled to an award of a contract for the facilities for which its bid was reasonably competitive with Allied, even if its bid was somewhat higher.
The statute implicated in this case was one of a trilogy of Buy American restrictions adopted in New Jersey during the Depression. A full understanding of the issues in dispute requires a careful reading of each of the statutes. The first two statutes were contained in chapter 174 of the Laws of 1932. *184 The portion relevant to counties and municipalities, originally designated as N.J.S.A. 40:15-1, provided:
American goods and produce to be used where possible
All counties and municipalities shall provide in the specifications for all contracts for county and municipal work and in the specifications for all contracts for work for which they pay any part of the cost, that only manufactured and farm products of the United States, wherever available, be used in such work.
That portion of chapter 174 of the Laws of 1932, relative to state work is designated as N.J.S.A. 52:32-1. It provides:
American goods and products to be used in state work
The state shall make provisions in the specifications for all contracts for state work and for work for which the state pays any part of the cost, that only such manufactured and farm products of the United States, whenever available, be used in such work.
In 1934 a provision was adopted relative to the use of domestic materials on state public work projects. It was very similar to a statute adopted by the federal government in 1933 designated as the Buy American Act. 41 U.S.C.A. §§ 10a-d. The state public work restrictions are contained within N.J.S.A. 52:33-2 and 3:
Only domestic materials to be used on public works; exception
Notwithstanding any inconsistent provision of any law, and unless the head of the department, or other public officer charged with the duty by law, shall determine it to be inconsistent with the public interest, or the cost to be unreasonable, only domestic materials shall be acquired or used for any public work.
....
Provision in contract; exception of particular materials
Every contract for the construction, alteration or repair of any public work in this state shall contain a provision that in the performance of the work the contractor and all subcontractors shall use only domestic materials in the performance of the work; but if the head of the department or other public officer authorized by law to make the contract shall find that in respect to some particular domestic materials it is impracticable to make such requirement or that it would unreasonably increase the cost, an exception shall be noted in the specifications as to that particular material, and a public record made of the findings which justified the exception.
In 1971 the bidding laws were compiled in a revision known as the Local Public Contracts Law. N.J.S.A. 40:15-1 was *185 retained in substantially the same form. It was designated as N.J.S.A. 40A:11-18. In its present form, the statute has been broadened somewhat by an amendment contained in chapter 107 of the Laws of 1982. The statute now reads:
American goods and products to be used where possible
Each local unit shall provide, in the specifications for all contracts for county or municipal work or for work for which it will pay any part of the cost, or work which by contract or ordinance it will ultimately own and maintain, that only manufactured and farm products of the United States, wherever available, be used in such work.
Thus, by way of summary, the statutes regulating local government purchases [N.J.S.A. 40A:11-18] and state purchases of goods and products [N.J.S.A. 52:32-1] require that American products be bought "wherever" or "whenever" available. In contrast, the statutes concerning state public work [N.J.S.A. 52:33-2 and 3] expressly provide authority to dispense with the Buy American requirement in appropriate circumstances.
In K.S.B. Technical Sales Corp. v. North Jersey District Water Supply Commission, 75 N.J. 272 (1977), app. dism. 435 U.S. 982, 98 S.Ct. 1635, 56 L.Ed.2d 76 (1978) (hereinafter K.S.B.), the Supreme Court considered constitutional challenges to the Buy American requirements of N.J.S.A. 52:33-2 and 3. As highlighted above, the provisions involved in K.S.B. differ substantially from the statute applicable to local governmental units. The question is whether the significant difference in the wording of the statutes should result in a different disposition of the constitutional issues. Assuming that the constitutional result is the same, the court must ask whether a local unit of government is required to purchase American products wherever available regardless of cost or other considerations.
The statutes involved in K.S.B. were challenged on three constitutional grounds. The issues were the applicability and effect of the General Agreement on Tariffs and Trade (GATT), the alleged conflict between the Buy American provisions and *186 the foreign affairs power and the alleged conflict between the Buy American provisions and the Commerce Clause.
The General Agreement on Tariffs and Trade is an international compact to which the United States is a party. The Buy American statutes involved in K.S.B. appeared to conflict facially with a GATT provision requiring that the products of any contracting party imported into the territory of another contracting party be accorded treatment no less favorable than that accorded to like products of the importing country. However, the K.S.B. Court found the provisions of GATT to be inapplicable to the Buy American statutes because of an exception within the treaty which excluded products which were purchased by a governmental agency for governmental purposes, not for commercial sale and not with a view to use in the production of goods for commercial sale. The K.S.B. Court held that products used for construction of a water treatment plant fell within that exception. Clearly, products used for sewerage facilities should fall within the exception as well. Therefore, the GATT exception applies in this case as it did in K.S.B.
K.S.B. next considered the allegation that N.J.S.A. 52:33-2 and 3 impermissibly intruded into the field of foreign affairs, an area constitutionally reserved to Congress and the President. K.S.B. concluded that the New Jersey Legislature, through the Buy American provisions under review, had not required the government to engage in the "sensitive business of evaluating the politics of countries whose citizens seek to market their products in this State." 75 N.J. at 291. The Court found that the Buy American provisions applied without discrimination based on the ideology of the seller's country and constituted a permissible intrusion into the foreign affairs powers because the intrusion was neither significant nor direct.
K.S.B. recognized that a different result was reached in Bethlehem Steel Corp. v. Bd. of Comm'rs. of Dept. of W. & P., 276 Cal. App.2d 221, 80 Cal. Rptr. 800 (App. 1969). There, a *187 California court held unconstitutional the California Buy American Act which contained an absolute requirement that only materials manufactured in the United States could be purchased by governmental bodies. The K.S.B. Court distinguished the California decision on several grounds. First, it found that the New Jersey statute, unlike the California statute, provided discretion where the cost would be unreasonable or the purchase would be either inconsistent with the public interest or impracticable. It noted also that the California act did not consider the express exemption in GATT into which the New Jersey legislation fit. K.S.B. found that this exemption indicates that the federal government has not foreclosed state action which does not have a significant and direct impact on foreign affairs. In fact, K.S.B. reasoned that the federal policy reflected by the GATT exemption would tolerate state action which is not inconsistent with the overriding federal approach to foreign trade. K.S.B. concluded that not every and any state statute which in any way touches upon foreign affairs is proscribed. It asserted that the states may properly exercise their police powers and in so doing have some permissible effect on foreign trade. 75 N.J. at 293.
Does the difference in wording between N.J.S.A. 40A:11-18 and N.J.S.A. 52:33-2 and 3 require a different result than that reached in K.S.B. with respect to the foreign affairs challenge? N.J.S.A. 40A:11-18 appears to fall somewhere between the California provision and the New Jersey provision involved in K.S.B. The California court acknowledged that its statute constituted an absolute embargo on foreign products. Bethlehem Steel Corp., 276 Cal. App.2d at 225, 80 Cal. Rptr. at 803. The New Jersey Buy American law, as it relates to local governments, is not an absolute embargo because, even if it is read literally, it would permit the purchase of foreign products where American products are not available. Furthermore, if N.J.S.A. 40A:11-18 is an absolute embargo, the statute would still in all likelihood be sustained under the K.S.B. analysis, unless it were clearly shown that it has a significant and direct *188 impact on foreign affairs. There is no attempt by a local agency, when it complies with N.J.S.A. 40A:11-18, to conduct "minute inquires into the ideological climates of foreign countries...." 75 N.J. at 290.
It could be argued that K.S.B. utilized the express exception provided in the state Buy American statute allowing some discretion to the purchasing agency to buttress the Court's conclusion that the state statute had a "more limited impact on foreign affairs" than the statute involved in Bethlehem Steel. Id. at 292. As has been noted earlier, the statute before this court has no such express exception. However, it appears that K.S.B. did not turn its holding on this distinction. It is interesting to note that, at the outset of its opinion, the Court stated that both the trial court and the Appellate Division had found that the applicable statutes involved in K.S.B. were N.J.S.A. 52:33-2 and 3 and not N.J.S.A. 40A:11-18, as was cited in the bid specifications. The Supreme Court agreed and in so doing said:
Because the New Jersey Legislature has embraced the Buy American concept in almost all facets of governmental operations in substantially the same manner, none of the parties has raised any question in respect of the erroneous statutory citation in the specifications. [Id. at 278; emphasis supplied]
There are other indications in the K.S.B. opinion that our Supreme Court, for the purposes of its constitutional analysis, was treating the impact of the various Buy American statutes similarly, notwithstanding the difference in their wording.
The court is satisfied that the comments by the Supreme Court concerning the language comparison of the New Jersey and California statutes were made in passing. The Court's holding, as it applies to the foreign affairs issue, is that state regulation is permitted as long as it does not have a demonstrably significant and direct impact on foreign affairs. There is no showing in this case that N.J.S.A. 40A:11-18 has a significant and direct impact even if it is seen as more restrictive than the statute before the K.S.B. Court.
*189 The third constitutional challenge raised in K.S.B. was the alleged conflict of the Buy American statutes with the Commerce Clause. The Court noted that controversies involving the proscription against state interference in commerce have centered around direct or indirect state attempts to establish economic barriers avoiding free trade among the states and preventing foreign competition. It concluded, based upon its reading of Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) and American Yearbook Co. v. Askew, 339 F. Supp. 719 (M.D.Fla. 1972), aff'd 409 U.S. 904, 93 S.Ct. 230, 34 L.Ed.2d 168 (1972), that legislation concerning a state's purchase of goods and material for its own end use, at least in the absence of federal action, is not subject to the usual Commerce Clause restrictions. The Court acknowledged that Congress has expressed a policy judgment that foreign commerce will not be unduly burdened when the federal government and its agencies are market participants and prefer domestic products in their purchases. The Buy American provisions are deemed measures regulating private, not public business. The Court concluded that state statutes patterned after the federal act are consonant with that policy.
Again, as with its analysis of the foreign affairs power, the Court recognized that N.J.S.A. 52:33-2 and 3 are not framed in the absolute. Presumably, the Court was comparing those statutes to the embargo provision contained within the California Buy American statute. As with the foreign affairs challenge, it must be conceded that the statute before this court, while not framed in the absolute, is more absolute than N.J.S.A. 52:33-2 and 3 and closer to the wording struck down in Bethlehem Steel. Should that cause a result different from that reached in K.S.B.? Again, as with the foreign affairs challenge, it appears that the Supreme Court did not base its conclusion concerning the Commerce Clause on the distinction between the wording of the New Jersey and California statutes. Rather, the Court relied on the proposition that the market participant principle established in Alexandria Scrap exempted *190 Buy American provisions from the Commerce Clause restrictions. K.S.B., 75 N.J. at 300.
In short, the distinction drawn in K.S.B. between the New Jersey Buy American statute and the California Buy American statute is not central to the result in K.S.B. or here. If that is not so, there could be serious questions as to the constitutionality of N.J.S.A. 40A:11-18.
Thus, the court holds that N.J.S.A. 40A:11-18 is constitutional. However, the court must next determine whether local units of government are compelled to purchase American products, wherever available, regardless of cost, quality, efficiency or other considerations. A literal reading of the statute can support the argument that American products must be purchased wherever available. The Legislature has the right to establish that policy. However, a less rigid reading of the statute can support the contention that the term "wherever available" implies discretion. The literal approach finds neither support in case law nor confirmation in any legislative history or presumed intent. The less rigid approach finds inferential support in case law and legislative action. The Court in K.S.B. suggested that all of the Buy American statutes in New Jersey embraced the concept "in substantially the same manner." K.S.B. at 278. That comment indicates that the Court thought all of the statutes provided discretion to the bidding agency. Furthermore, two years after the adoption of the predecessor of N.J.S.A. 40A:11-18, the Legislature adopted N.J.S.A. 52:33-2 and 3, which gave the State discretion to buy foreign materials for public works. There is no apparent basis to justify a distinction between the scope of the Buy American restriction as it relates to products governed by N.J.S.A. 40A:11-18 and N.J.S.A. 52:32-1, as compared to public works governed by N.J.S.A. 52:33-2 and 3. Admittedly, neither arguments based on legislative intent nor the accompanying presumptions are usually conclusive. However, it must be asked why the Legislature would place severe Buy American restrictions on products *191 and thereafter provide much broader discretion as to the Buy American preference for public works. A review of the legislative history provides nothing to assist the court in determining legislative intent beyond these inferences. Therefore, the court sought to elicit testimony which might disclose a meaning through the experience of those responsible for implementing the requirement.
The historical pattern of implementation of N.J.S.A. 40A:11-18 provides evidence that bidding authorities have either found discretion in the statute or sought to avoid its literal terms. It is well established that the court may refer to long-term usage, contemporaneous construction and practical interpretation in construing statutes for the purpose of ascertaining the meaning of the statute, to confirm a construction deduced from the language of the statute, to explain a doubtful phrase or to ascertain the meaning of the phrase if obscurely expressed. Pringle v. N.J. Civil Service Dept., 45 N.J. 329, 332-333 (1965); N.J. Assn. of Correction v. Lan, 80 N.J. 199, 214-215 (1979), 2A Sutherland, Statutes and Statutory Construction (4 ed. 1984), § 49.07 at 393-394. A review of the testimony at the plenary hearing is illuminating.
The purchasing agent for the OCUA stated that the authority awarded approximately 50 to 75 bids per year. While the preference for American goods was contained in all bid specifications, she had only one previous objection that the low bidder was providing a foreign product. The objector did not pursue the claim.
The OCUA has always awarded the contract to the lowest responsible bidder. Furthermore, the authority does not question whether the product was made in America. No affidavit is required. The purchasing agent conceded that long before this litigation, she was aware Allied's product was not made in America. When she considered the words "wherever available," within the context of this case, she concluded that the *192 term meant the most cost effective product available regardless of its origin.
The next witness was the supervisor of the purchasing bureau of the New Jersey Department of the Treasury. He is responsible for administering centralized purchasing exceeding 900 million dollars per year. He has been performing this function since 1973 and is familiar with all of the statutes in Title 52 relating to state purchases. It was his opinion that chapter 32 pertains to building construction and requires the purchase of American products "whenever available." Nonetheless, he interpreted that language to provide discretion to the bidding authority to buy foreign products where justified by cost, quality differential and other considerations. He found that chapter 33 of Title 52 is more closely related to the acquisition of products to be used in public works contracts and that discretion was expressly provided in that chapter to buy foreign products. Finally, he pointed out that chapter 34 covers what he defined as "pure product purchases" such as paper, pencils, furniture and the like. That chapter contains no Buy American requirement at all. He provided a bid specification for rock salt which contained an explicit provision reciting that domestic or foreign sources of supply would be acceptable.
In essence, the witness described a state policy which, as applied, does not require literal compliance with Buy American provisions under any circumstances. The presence or absence of discretionary language in Title 52 does not seem to affect the State's exercise of discretion regardless of which statute is applicable to the purchase. Moreover, he acknowledged that the State does not verify compliance with Buy American requirements in its own purchases or in purchases by municipalities through state contracts under N.J.S.A. 52:25-16.1.
Next to testify was the City of Wildwood purchasing agent who is responsible for the issuance of approximately 100 bid specifications each year. He has held that position for ten years and is active in organizations involved in purchasing *193 issues. He recounted four disputes concerning the Buy American requirement which highlight the problems created by N.J.S.A. 40A:11-18 if it is strictly interpreted as requiring the purchase of American products wherever available.
(1) The first dispute concerned the purchase of Ford and Chevrolet automobiles. It was determined that they were manufactured in Canada. He avoided that problem by buying the same product through a state contract even though the state contract automobiles were also manufactured in Canada.
(2) The next problem related to the purchase of beach tractors. The second lowest bidder contended that the lowest bidder's product was made in Yugoslavia. The lowest bidder acknowledged that it was a Yugoslavian company but asserted that its product was assembled in Tennessee. It also countered that even though the second lowest bidder was an American company, its product was manufactured in Italy. Thought was given to tailoring the bids to one bidder. That concept was rejected as being violative of the statute. Ultimately, new bid specifications were developed so that other bidders could participate.
(3) With respect to the purchase of rock salt, a low bidder admitted that some of his product was mined in America and some of it was not. The rock salt was commingled. The award was made nonetheless and no one challenged the action.
(4) When the city solicited bids for telephones a bidder claimed that it would supply the only pure American product. In fact, there were some non-American parts in that bidder's telephone. The bidder then claimed it had fewer non-American parts in its product than the other bidders. However, another bidder alleged that, in cost terms, its telephone had less non-American parts than all other bidders. Ultimately, all bids were rejected.
Finally, this witness testified that all governmental purchasing agencies try to avoid the Buy American issue. He conceded *194 that he did not attempt to verify compliance but only acted when he received an inquiry from one of the bidders.
The next witness was the Borough of Wildwood Crest comptroller and treasurer. He had previously been a purchasing agent for twelve years. He authenticated a resolution adopted by the National Institute of Governmental Purchasing, Southern New Jersey Chapter, which recites the following relevant findings:
(1) It is common to obtain foreign made components, assemble them in another country and ship them to the United States for final assembly, sale or distribution.
(2) There are no regulatory guidelines or case law definitions to assist public purchasing officials in making a determination whether a particular product is American made.
(3) The statute does not define the terms "manufactured" or "foreign" products.
(4) The literal implementation of the statute would require local units to break down the components of a product, perform an investigation into the origin of each part or analyze the molecular particles found in the same and quantify each element to determine if compliance has been achieved.
The following witness was the Warren County director of purchasing. He has held that position for 11 years and also had private purchasing experience for an additional 13 years. He is involved in many government purchasing organizations and is the president of the Governmental Purchasing Association of New Jersey. He experienced three specific problems with the statute:
(1) Bids were received for the purchase of telephones. The low bidder was Hitachi. That name gave him a signal that the product might be foreign made. The low bidder argued that its product was American made but investigation showed it was not. The next low bidder was Executone which makes some American products and some foreign products. Apparently, *195 the bidding authority was satisfied with that and accepted the Executone bid.
(2) Cast iron inlets were acquired in connection with a road project. Some of them were installed before another bidder noticed that the product had a stamping indicating it was foreign made. The objector did not pursue the protest.
(3) Rock salt bids were challenged by a bidder claiming that the salt was not American. County counsel interpreted the law as not applying to rock salt because it was a mined product and not a farm or manufactured product.
The witness concluded that his statewide experience is that all bidding agencies support the Buy American concept but also recognize their responsibility to save taxpayers' dollars. In most cases, other than referencing the statute in their specifications, they do not verify product origin.
The final witness was the chief of the Bureau of Local Management Services of the Division of Local Government Services of the New Jersey Department of Community Affairs. His unit provides administrative assistance to local agencies in bidding matters. He answers 85 to 110 telephone calls a month concerning bid issues. His agency promulgates bidding guidelines and regulations. He had reviewed 15 years of records and found varied inquiries concerning the Buy American provision. He testified that his agency's standard response is that American products should be bought "wherever available." However, he opined that "people out there" do not generally accept that advice. Normally, they reject the bids or find another way around the restriction. He also stated that in this age of high technology the volume of questions relating to a country of origin has increased because of claims that a product is foreign assembled as opposed to foreign manufactured. He concluded that more times than not, if no one objects, awards are being made to the lowest bidder even if they are supplying a non-American product.
*196 The underlying theme of virtually all of the testimony is an unwillingness to accept the proposition that the statute mandates purchases of American products irrespective of cost, quality and other factors. Some witnesses reached this result based on their understanding that the words of the statute allowed discretion. Others reacted pragmatically in an effort to respond to what they believed was the public interest and with the assumption that the law permitted that flexibility. The inference to be drawn from this reaction is that the witnesses were presuming that the Legislature intended a reasonable result and that buying American under all circumstances does not accomplish that end. Indeed, our case law supports the proposition that, absent clear legislative intent, we should assume the Legislature sought a reasonable approach and if possible the statute should be so construed. Roman v. Sharper, 53 N.J. 338, 341 (1969). We should not presume the Legislature intended an absurd result. State v. Gill, 47 N.J. 441 (1966).
In summary, the statute is susceptible to two interpretations. The literal reading provides a clear mandate which will avoid the vagueness inherent in exercising discretion. Yet, a more flexible interpretation is more reasonable. First, it accords closely with the substantially similar treatment given to all Buy American statutes in K.S.B. Second, it comports with the inferences to be drawn from legislative action in adopting statutes containing express discretionary language contemporaneous with the adoption of the local Buy American requirements. Finally, it is consistent with the past application of the statute.
The court concludes that, in some circumstances, the OCUA has discretion to buy a foreign product even if an American product is available. However, given the evident statutory intent to provide at least a preference for American products, the OCUA must demonstrate that it has acted reasonably. N.J.S.A. 52:33-2 and 3, which allow discretion in state *197 purchases, require the State to justify the purchase of foreign materials. The OCUA has the same obligation.
Admittedly, this result brings uncertainty to the bidding process. Henceforth, the bidding agencies could be subjected to litigation testing the reasonableness of their exercise of discretion. The suppliers, whether American or foreign, can challenge the soundness of the bidding agency's judgment. Certainty is one of the key ingredients of an effective and credible bidding law. Pucillo & Sons, Inc. v. Mayor and Council of New Milford, 73 N.J. 349, 355 (1977). Therefore, it appears that legislative action would be desirable to address this issue and clarify the responsibility of local governmental bodies involved in public bidding. The policy determination belongs to the Legislature. It can choose to give an absolute preference to American products. However, if discretion is to be allowed, definitive guidelines are needed to put bidders on an equal footing and protect governmental bodies against unnecessary litigation.
In light of the court's holding, a plenary hearing will be conducted to determine whether the OCUA acted reasonably in awarding all three contracts to Allied.