# Whether Uruguay Round Agreements Required Ratification as a Treaty

The Uruguay Round Agreements concluded under the auspices of the General Agreement on Tariffs and Trade did not require ratification by the Senate as a treaty, but could constitutionally be executed by the President and approved and implemented by Act of Congress

November 22, 1994

MEMORANDUM OPINION FOR THE
UNITED STATES TRADE REPRESENTATIVE

This memorandum supplements our earlier opinion on the question whether the Uruguay Round Agreements concluded under the auspices of the General Agreement on Tariffs and Trade (the "GATT") must be ratified as a treaty.[1] It replies to two later papers by Professor Laurence H. Tribe, and his testimony before the Senate Committee on Commerce, Science, and Transportation, that have disputed our conclusion on that subject.[2] After considering Professor Tribe's arguments, we again conclude that the Uruguay Round Agreements may constitutionally be adopted by the passage of implementing legislation by both Houses of Congress, together with signing by the President.

## I. The Treaty Clause

Professor Tribe argues that there exists, for constitutional purposes, "a discrete subset of international agreements properly categorized as treaties."[3] Professor

---

[1] *See* Memorandum for Ambassador Michael Kantor, U S Trade Representative, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re· Whether the GATT Uruguay Round Must be Ratified as a Treaty* (July 29, 1994) (the "OLC GATT Memorandum"). The GATT originated in 1947 *See* 61 Stat. A-3, T I.A S No. 1700 "Essentially the GATT is now a group of some 200 treaties consisting of very complex amendments, side codes, special agreements and so on " *What's Needed for the GATT After the Uruguay Round*?, Remarks by John H Jackson, 1992 Proc Am. Soc'y Int'l L 69, 71. In 1979, Congress approved fourteen trade agreements on matters ranging from antidumping and government procurement to a bilateral trade agreement with Hungary *See* 19 U.S.C. § 2503. The Uruguay Round Agreements include successor agreements to many of these prior trade agreements

[2] *See* Letter for the President from Professor Laurence H. Tribe (Sept 12, 1994) (the "Tribe Letter"), Memorandum for Walter Dellinger, Abner J Mikva, George J. Mitchell and Robert Dole, from Laurence H. Tribe, *Re The Constitutional Requirement of Submitting the Uruguay Round as a Treaty* (Oct. 5, 1994) (the "Tribe GATT Memorandum"), *S. 2467, GATT Implementing Legislation. Hearings Before the Senate Comm on Commerce, Science, and Transportation*, 103d Cong (1994) (Prepared Statement of Laurence H Tribe, Professor, Harvard University Law School) (the "Tribe Prepared Statement") The bulk of the Tribe GATT Memorandum, and parts of the Tribe Prepared Statement, are devoted to criticizing the views of Professors Bruce Ackerman and David Golove in their Letter to the President (Sept 21, 1994), and in a forthcoming book. We take no position in the dispute among Professors Tribe, Ackerman and Golove

[3] Tribe GATT Memorandum at 2.

Tribe "readily admit[s]," however, "that the Constitution itself provides little guidance about the content of this category."[4] He also concedes that "[t]he Supreme Court has never addressed directly the constitutionality of using the congressional-executive agreement to deal with matters that fall within the Constitution's 'treaty' category."[5] Nor does he attempt "to construct any sort of general test for determining whether any given agreement should be considered a treaty."[6] Despite that, Professor Tribe insists that "[the Uruguay Round] warrants the high level of deliberation and consensus that the formal requirements of the Treaty Clause guarantee."[7]

Like Professor Tribe, we find that neither the text of the Constitution, nor the materials surrounding its drafting and ratification, nor subsequent Supreme Court case law interpreting it, provide clear-cut tests for deciding when an international agreement must be regarded as a "treaty" in the constitutional sense, and submitted to the Senate for its "Advice and Consent" under the Treaty Clause, U.S. Const. art. II, § 2, cl. 2.[8] In such circumstances, a significant guide to the interpretation of the Constitution's requirements is the practical construction placed on it by the executive and legislative branches acting together. *See, e.g., The Pocket Veto Case*, 279 U.S. 655, 689-90 (1929) ("[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character. Compare . . . *State v. South Norwalk*, 77 Conn. 257, 264 [(1904)], in which the court said that a practice of at least twenty years duration 'on the part of the executive department, acquiesced in by the legislative department, while not absolutely binding on the judicial department, is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning.'"); *Youngstown Sheet & Tube Co.*

---

[4] *Id* at 17

[5] *Id* at 12

[6] *Id.* at 17, *see also* Tribe Prepared Statement at 310 ("I do not offer a comprehensive set of criteria for defining the boundary between treaties and other international agreements . . . ").

[7] Tribe GATT Memorandum at 20, *see also* Tribe Prepared Statement at 310

[8] Professor Tribe has invented his own five-part test for concluding that the Uruguay Round Agreements must be considered a treaty in the constitutional sense *See* Tribe GATT Memorandum at 19-20; *see also* Tribe Prepared Statement at 310 (four-factor test) The suggested criteria might provide useful guidelines to executive branch policymakers in deciding whether to submit an international agreement to the Senate for its concurrence rather than to Congress as a whole, but we see no reason to think that Professor Tribe's tests are *constitutionally* compelled (Further, Professor Tribe's application of his own tests rests on erroneous assumptions about the powers of the World Trade Organization and the effects of the Uruguay Round Agreements. *See* Part III below )

Professor Tribe also notes that the State Department has its own longstanding guidelines for advising policymakers when to consider an international agreement to be a treaty requiring Senate concurrence. *See* Tribe GATT Memorandum at 18-19 (citing State Dep't Circular 175 (Dec 13, 1955), as amended, 11 Foreign Affairs Manual, ch. 700, § 721 3) By Professor Tribe's own showing, however, the application of these guidelines to the Uruguay Round Agreements is inconclusive, even accepting Professor Tribe's analysis, only four of the eight factors on the State Department's list support the view that Senate concurrence should be obtained for the Uruguay Round Agreements Tribe GATT Memorandum at 18. Moreover, the State Department's guidelines are not intended to be constitutional *tests* determining whether or not an international agreement must be ratified as a treaty, but rather to articulate the *policy* considerations that the executive branch should follow in deciding what procedures to follow with regard to such agreements

*v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring) ("The Constitution is a framework for government. Therefore the way the framework has consistently operated fairly establishes that it has operated according to its true nature."). Indeed, the Court has been particularly willing to rely on the practical statesmanship of the political branches when considering constitutional questions that involve foreign relations. *See, e.g., United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981); *see also* Harold H. Koh, *The National Security Constitution* 70-71 (1990) (historical precedent serves as "quasi-constitutional custom" in foreign affairs); Griffin B. Bell & H. Miles Foy, *The President, the Congress, and the Panama Canal: An Essay on the Powers of the Executive and Legislative Branches in the Field of Foreign Affairs*, 16 Ga. J. Int'l & Comp. L. 607, 640-41 (1986); Gerhard Casper, *Constitutional Constraints on the Conduct of Foreign and Defense Policy: A Nonjudicial Model*, 43 U. Chi. L. Rev. 463, 478 (1976).

Such practical construction has long established (and Professor Tribe acknowledges) that "there are many classes of agreements with foreign countries which are not required to be formulated as treaties" for constitutional purposes.[9] Most pertinently here, practice under the Constitution has established that the United States can assume major international trade obligations such as those found in the Uruguay Round Agreements when they are negotiated by the President and approved and implemented by Act of Congress pursuant to procedures such as those set forth in 19 U.S.C. §§ 2902 & 2903.[10] In following these procedures, Congress acts under its broad Foreign Commerce Clause powers,[11] and the President acts pursuant to his constitutional responsibility for conducting the Nation's foreign affairs.[12] The use of these procedures, in which both political branches deploy sweeping constitutional powers, fully satisfies the Constitution's requirements; the Treaty Clause's provision for concurrence by two-thirds of the Senators present is not constitutionally mandatory for international agreements of this kind.[13]

---

[9] *Validity of Commercial Aviation Agreements*, 40 Op Att'y Gen. 451, 452 (1946), *see also United States v. Curtiss-Wright Export Corp.*, 299 U S 304, 318 (1936), Tribe GATT Memorandum at 2-3

[10] For a survey of the various statutory régimes relating to international trade agreements in the period from 1930 onwards, *see* Harold H. Koh, *Congressional Controls on Presidential Trade Policymaking After I N.S. v Chadha*, 18 N.Y.U J Int'l L. & Pol. 1191, 1192-1208 (1986). On Congressional-Executive agreements generally, *see* Kenneth C. Randall, *The Treaty Power*, 51 Ohio St L J. 1089, 1093-96 (1990).

[11] *See* U S. Const art. I, § 8, cl. 3; *Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U S 298, 329 (1994), *California Bankers Ass'n v. Schultz*, 416 U S. 21, 59 (1974). The Treaty Clause should not be interpreted to curtail Congress's power under the Foreign Commerce Clause *See Downes v Bidwell*, 182 U.S. 244, 313 (1901) (White, J , joined by Shiras and McKenna, JJ , concurring), *id.* at 370 (Fuller, C.J., joined by Harlan, Brewer and Peckham, JJ , dissenting).

[12] *See, e g , Department of Navy v Egan*, 484 U.S 518, 529 (1988) (Supreme Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive '" (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)), *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U S 682, 705-06 n 18 (1976) ("the conduct of [foreign policy] is committed primarily to the Executive Branch"); *United States v Louisiana*, 363 U.S. 1, 35 (1960) (President is "the constitutional representative of the United States in its dealings with foreign nations.").

[13] Although we insist on the variety of legal instruments by which the United States may make agreements with foreign nations, we do not dispute Professor Tribe's view that some such agreements may have to

Professor Tribe recognizes the existence of these decades-old practices, which have resulted in the approval of such fundamental trade pacts as the North American Free Trade Agreement (the "NAFTA").[14] But he disparages the use of Congressional-Executive agreements as merely a matter of "political leaders' casual approach to the Constitution."[15] This dismissive characterization gives virtually no weight to the considered constitutional judgments of the political branches.[16] We believe that that approach is mistaken. Disagreements and uncertainties surrounding the scope of the Treaty Clause — including its interaction with Congress's power to regulate commerce — are two centuries old. *See below.* Congress's Foreign Commerce Clause authority and the President's responsibility for foreign affairs are unquestionably broad. In such circumstances, the political branches can fairly conclude — and have in fact concluded — that even major trade agreements such as the Uruguay Round Agreements may be approved and implemented by Acts of Congress, rather than ratified as treaties.[17] Indeed, Professor Tribe himself wrote in 1988 that "it does appear settled that a hybrid form of international agreement — that in which the President is supported by a Joint Resolution of Congress — *is coextensive with the treaty power.* Such Congressional-Executive

---

be ratified as treaties. Thus, Professor Tribe is incorrect in asserting that we believe that the treaty ratification process and the ordinary legislative process are interchangeable *See* Tribe GATT Memorandum at 3 On the contrary, we explicitly stated that we were not considering that claim *See* OLC GATT Memorandum at 4-5 n 8 (Indeed, as Professor Tribe points out, the State Department's guidelines in Circular 175 themselves attest to the executive branch's view that some international agreements should be considered to be treaties. *See* Tribe Prepared Statement at 298.) Moreover, absolutely nothing in the OLC GATT Memorandum implies that "the Treaty Clause is to be read out of the Constitution " Tribe Letter at 3 Whatever may be true of other international agreements such as the United Nations Charter, *see* Tribe GATT Memorandum at 8, our contention is only that trade agreements such as the Uruguay Round Agreements do not require ratification as "treaties "

[14] *See* Tribe GATT Memorandum at 7 The Tribe Prepared Statement specifically questions the constitutionality of two earlier free trade agreements — NAFTA and the 1988 Free Trade Agreement with Canada. *Id.* at 14 In the earlier Tribe GATT Memorandum, however, Professor Tribe wrote that NAFTA "is surely less sweeping in its scope [than the Uruguay Round Agreements] and at most shows that the Uruguay Round might represent the second, even if not the first, agreement of its kind that became law without Senate ratification " *Id.* at 8 In view of his varying statements, we are uncertain of the status of *existing* trade agreements — NAFTA, the Canadian Free Trade Agreement, the 1979 Tokyo Round, and the United States-Israel Free Trade Agreement — on Professor Tribe's theory

[15] Tribe GATT Memorandum at 11, *see also id* at 2 ("prior manifestations of a casual attitude toward the Constitution's structural requirements are insufficient in this context to justify abandoning the precise guarantees of the Treaty Clause").

[16] Professor Tribe himself acknowledges that "[t]he issue whether major international agreements should be submitted for majority approval by Congress or for supermajority approval by the Senate was the topic of fierce debate in the halls of Congress, the popular press, and the pages of law reviews during the 1940s." Tribe GATT Memorandum at 6 In light of that vigorous and protracted debate, it is strange that Professor Tribe should dismiss the political branches' practice as a mere matter of "political convenience " *Id* at 11

[17] If the Senate believed that this practice trenched on powers that belong to it, then it had "both the incentive to protect its prerogatives and institutional mechanisms to help it do so." *United States v Muñoz-Flores*, 495 U.S 385, 393 (1990) The fact that it has not done so "is relevant to the substantive task of interpreting" the Treaty Clause *Id* at 404 n 2 (Stevens, J., concurring in judgment) It is not at all unlikely that the Senate might guard against perceived encroachments on its constitutional prerogatives: as Professor Tribe notes, the Senate has in other recent contexts insisted on its claimed prerogatives under the Treaty Clause. *See* Tribe GATT Memorandum at 3 (Vienna Convention); *see also* Harold H Koh, *The National Security Constitution* at 43 (Anti-Ballistic Missile Treaty)

agreements are the law of the land, superseding inconsistent state or federal laws." Laurence H. Tribe, *American Constitutional Law* 228 n.18 (2d ed. 1988) (emphasis added).

Historically, the scope of the Treaty Clause, and its interplay with other constitutional clauses, have provoked controversies of several different kinds. The persistence of these controversies (which trace back to the eighteenth century), and the nearly complete absence of judicial decisions resolving them, underscore the necessity of relying on congressional precedent to *interpret* the relevant constitutional provisions. No one could deny that "congressional practice alone cannot justify abandonment of the Constitution's structural provisions,"[18] but it begs the question to assume that the treaty ratification process *is* structurally required by the Constitution in cases such as this.[19] Like other "great ordinances of the Constitution," the Treaty Clause "do[es] not establish and divide fields of black and white." *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 209 (1928) (Holmes, J., joined by Brandeis, J., dissenting).

One recurring kind of dispute over the Treaty Clause has been whether international agreements could be given effect by Executive action alone, or whether they required submission to the Senate for its concurrence. *See, e.g.*, 2 *Messages and Papers of the Presidents* 33 (James D. Richardson ed., 1896) (President Monroe's message to the Senate of April 6, 1818, expressing uncertainty whether the Executive alone could make an international agreement for the naval disarmament of the Great Lakes, or whether Senate advice and consent was required).[20] A second type

---

[18] Tribe Prepared Statement at 299

[19] Professor Tribe's repeated invocation in this connection of *INS v Chadha*, 462 U S 919 (1983), which invalidated the one-House "legislative veto," is not to the point *See, e g*, Tribe Prepared Statement at 299-300, Tribe GATT Memorandum at 10-11 First, the *Chadha* Court found Article I's provisions for bicameral passage of legislation and its presentment to the President, which it held offended by the legislative veto, to be "[e]xplicit and unambiguous " 462 U S at 945. That cannot be said of the Treaty Clause, whose meaning and scope have long been found to be highly indeterminate. Second, the Executive, albeit not invariably, had long taken the position that the legislative veto violated separation of powers principles. *See id.* at 969-74 (White, J., dissenting; *see also Reprogramming—Legislative Committee Objection*, 1 Op O.L.C 133, 135 (1977) (Indeed, the Senate Judiciary Committee, after careful historical study, reached a similar conclusion *See* S Rep. No 54-1335, at 8 (1897).) By contrast, the practice of submitting major trade pacts as Congressional-Executive agreements has obviously required the approval of the Senate — the constitutional actor whose prerogatives Professor Tribe asserts have been jeopardized Finally, *Chadha* certainly does not imply that the longstanding practices of the political branches are *irrelevant* to the interpretation of the Constitution

We also note that while it is generally true that legislative precedent is most persuasive when it can be traced back to the Nation's founding, *see* Tribe GATT Memorandum at 10, Tribe Prepared Statement at 299, the Court's case law on the subject is in fact more complex than Professor Tribe indicates Even early legislative decisions may have violated the Constitution, *see, e g., New York Times Co v Sullivan*, 376 U S. 254, 276 (1964) (Sedition Act of 1798 violated First Amendment). On the other hand, in *United States v Midwest Oil Co.*, 236 U.S. 459 (1915), the Court upheld an 80-year old Presidential practice of temporarily withdrawing public lands from entry despite the absence of any express grant of authority for the practice It stated that "in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself — even when the validity of the practice is the subject of investigation." *Id* at 473

[20] President Monroe's uncertainty over the scope and meaning of the Treaty Clause is particularly striking, given that he himself had spoken to the Treaty Clause in the Virginia Ratifying Convention *See* 9 *The*

of recurring dispute, more pertinent here, centered on the respective powers of the Senate and the House of Representatives in such areas as the regulation of foreign trade, where different clauses of the Constitution assign responsibilities either to one House alone or to both Houses together. As Secretary of State Dulles explained in testimony before the Senate Judiciary Committee in 1953, there is an

> undefined, and probably undefinable, borderline between international agreements which require two-thirds Senate Concurrence, but no House concurrence, as in the case of treaties, and agreements which should have the majority concurrence of both Chambers of Congress. . . . This is an area to be dealt with by friendly cooperation between the three departments of Government which are involved, rather than by attempts at constitutional definition, which are futile, or by the absorption, by one branch of Government, of responsibilities which are presently and properly shared.

*Treaties and Executive Agreements: Hearings Before a Subcomm. of the Senate Comm. on the Judiciary*, 83d Cong. 828 (1953).

Intra-branch disputes over the Treaty Clause can be traced as far back as 1796, when Representative Albert Gallatin argued that the "[t]reaty-making power . . . may be considered as clashing" with Congress's "authority of regulating trade," and that "[a] difference of opinion may exist as to the proper construction of the several articles of the Constitution, so as to reconcile those apparently contradictory provisions." 5 Annals of Cong. 437 (1796); *see also id.* at 466-74 (arguing that Foreign Commerce Clause limits Treaty Clause); Note, *United States Participation in the General Agreement on Tariffs and Trade*, 61 Colum. L. Rev. 505, 511 (1961); *contrast* Tribe Letter at 3 (Treaty Clause limits Foreign Commerce Clause).

Again, in 1844, the Senate Foreign Relations Committee, under Senator Rufus Choate, presented a report on the Prussian and Germanic Confederation Treaty, in which the Committee urged rejection of the treaty because "the legislature is the department of government by which commerce should be regulated and laws of revenue be passed. The Constitution, in terms, communicates the power to regulate commerce and to impose duties to that department. It communicates it, in terms, to no other. Without engaging at all in an examination of the extent, limits, and objects of the power to make treaties, the committee believe that the general rule of our system is indisputably that the control of trade and the function of taxing belong, without abridgement or participation, to Congress." *Compilation of Reports of the Senate Committee on Foreign Relations, 1789-1901*, S. Doc. No. 56-231, pt. 8, at 36 (2d Sess. 1901).

---

*Documentary History of the Ratification of the Constitution* 1115 (John P. Kaminski, Gaspare J Saladino, et al eds., 1990), 10 *id.* at 1235 (1993).

From time to time, the House of Representatives has also insisted that a treaty be made dependent on the consent of both Houses of Congress. This has occurred when, for example, the House's power over appropriations has been at issue, as in the Gadsden purchase treaty of 1853 and the Alaskan purchase treaty of 1867.[21] In 1880, the House asserted that the negotiation of a commercial treaty that fixed duties on foreign imports would be an unconstitutional invasion of its prerogatives over the origination of revenues; in 1883, it demanded, in connection with a proposed commercial treaty with Mexico, to have a voice in treaties affecting revenue.[22]

In 1898, the United States annexed Hawaii by joint resolution, Joint Res. 55, 55th Cong., 30 Stat. 750 (1898), even though the Senate had previously rejected an annexation treaty, and even though opponents of the measure argued strenuously both in Congress and in the press that such an annexation could be accomplished only by treaty, and not by a simple legislative act.[23]

More recently, the court in *Edwards v. Carter*, 580 F.2d 1055 (D.C. Cir.) (per curiam), *cert. denied*, 436 U.S. 907 (1978), rejected the claim by members of the House of Representatives that the treaty power could not be used to transfer the Panama Canal to Panama. The plaintiffs relied on the Constitution's Property Clause, U.S. Const. art. IV, § 3, cl. 2, which commits to "[t]he Congress" the power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." The court answered this claim by pointing out that

> [t]he grant of authority to Congress under the property clause states that "The Congress shall have Power . . .," not that only the Congress shall have power, or that the Congress shall have exclusive power. In this respect the property clause is parallel to Article I, § 8, which also states that "The Congress shall have Power . . . ." Many of the powers thereafter enumerated in § 8 involve matters that were at the time the Constitution was adopted, and that are at the present time, also commonly the subject of treaties. The most prominent example of this is the regulation of commerce with foreign nations, Art. [I], § 8, cl. 3, and appellants do not go so far as to contend that the treaty process is not a constitutionally allowable means for regulating foreign commerce. It thus seems to us that, on its face, the property clause is intended not to restrict the scope of the treaty clause, but, rather, is intended to permit Congress to ac-

---

[21] *See* Louis Fisher, *Constitutional Conflicts between Congress and the President* 226 (3d ed 1991)

[22] *Id* at 227

[23] *See* Memorandum for Abraham D Sofaer, Legal Adviser, Department of State, from Douglas W Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, *Re. Legal Issues Raised by Proposed Presidential Proclamation to Extend the Territorial Sea*, 12 Op O L C 238, 251-52 (1988).

complish through legislation what may concurrently be accomplished through other means provided in the Constitution.

580 F.2d at 1057-58. As the court noted, the Constitution on its face permits foreign commerce to be regulated either through the Treaty Clause or through the Foreign Commerce Clause. Nothing in the language of the Constitution privileges the Treaty Clause as the "sole" or "exclusive" means of regulating such activity.[24] In actual practice, Congress and the President, understanding that nothing in the Constitution constrained them to choose one procedure rather than the other, have followed different procedures on different occasions.[25]

In general, these inter- and intra-branch disputes over the scope of the Treaty Clause have been resolved through the political process, occasionally with marked departures from prior practices. *See Goldwater v. Carter*, 444 U.S. 996, 1004 n.1 (1979) (Rehnquist, J., concurring in judgment); John O. McGinnis, *Constitutional Review by the Executive in Foreign Affairs and War Powers: A Consequence of Rational Choice in the Separation of Powers*, 56 Law & Contemp. Probs. 293, 305-08 (1993). For example, after the House of Representatives objected to the concentration of power over Indian affairs in the hands of the Senate through the Treaty Clause, Congress in 1871 enacted a rider to an Indian appropriation bill

---

[24] Accordingly, it has been held that a trade agreement executed by the President pursuant to the Reciprocal Trade Agreements Act of 1934, Pub L. No 73-316, 48 Stat 943, was a valid exercise of Congress's delegated Foreign Commerce Clause powers together with the President's inherent powers, and did not require separate ratification as a treaty, even if commercial treaties might also have covered the same subject matter *See Star-Kist Foods, Inc v United States*, 275 F 2d 472, 483-84 (C C.P.A 1959)

[25] The difficulties in attempting to privilege the Article II treaty ratification process over the powers conferred by Article I on Congress as a whole can be illustrated from Professor Tribe's own discussions of the war powers. Professor Tribe has recently joined several other professors of law in arguing that "the totality of Congress's Article I, § 8 powers reserves *to Congress alone* the prerogative and duty to authorize initiation of hostilities " Letter for Walter Dellinger, Assistant Attorney General, from Professor Laurence H. Tribe and others, at 3 (n d ; fax received October 14, 1994) (emphasis added). On that assumption, the existence of a mutual defense treaty between the United States and an ally, duly ratified by the Senate, would be legally insufficient, in the absence of further bicameral action by Congress, to justify engagement in hostilities. Yet Professor Tribe has written elsewhere that "[c]ollective defense treaties have become the way of military life in this century These treaties, ratified by the President pursuant to the consent of the Senate, generally commit the United States to come to the aid of any signatory that is militarily attacked. Whether these treaties can serve as a predicate for executive deployment of military force has not been resolved. It seems unlikely that, in the absence of a declaration of war by Congress, a prolonged military operation would be sanctioned by such a treaty Even if the treaty is, in a sense, an inchoate declaration of war, it is one formulated by the treatymakers — that is, the President and the *Senate* — not by the *Congress* as the Constitution demands More plausible, however, is the suggestion that a collective defense treaty justifies presidential use of force in support of a harried ally until Congress has had ample time to determine whether it favors American military involvement in the conflict." Laurence H. Tribe, *American Constitutional Law* at 233-34 (footnotes omitted)

Our point is not that there may be an inconsistency between the bald claim that Article I reserves to Congress alone the power to authorize the initiation of hostilities, and the more nuanced view that a mutual defense treaty can suffice to authorize interim military action on behalf of an ally (In fact, the positions might be reconciled ) Rather, we cite these writings only to show that a constitutional scholar as serious and thoughtful as Professor Tribe may experience difficulty in saying precisely when the Article I powers of Congress overlap with, when they oust, and when they are ousted by, the Senate's treaty power under Article II

declaring that no fresh treaties were to be made with the Indian nations. Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 566. Although the United States had been making Indian treaties for almost a century before that enactment, *see United States v. Kagama*, 118 U.S. 375, 382 (1886), after 1871 "the federal government continued to make agreements with Indian tribes, many similar to treaties, that were approved by both Senate and House," but "the House's action sounded the death knell for treaty making." Felix S. Cohen, *Handbook of Federal Indian Law* 107 & n.370 (1982 ed.). The policy of the 1871 enactment remains in effect. *See* 25 U.S.C. § 71. We are uncertain whether this longstanding legislation would be constitutional by Professor Tribe's lights.[26]

The existence of such recurring disputes over the scope and meaning of the Treaty Clause undermines any dogmatic claim that a major trade agreement such as the Uruguay Round Agreements, which stands at the intersection of the foreign affairs, revenue raising and commerce powers, *must* be ratified as a treaty and *cannot* be implemented by the action of both Houses of Congress. The distinctions between the Federal government's treaty power and the other constitutional powers in play are simply too fluid and dynamic to dictate the conclusion that one method must be followed to the complete exclusion of the other. Here, if anywhere, is an area where the sound judgment of the political branches, acting in concert and accommodating the interests and prerogatives of one another, should be respected. It is simply mistaken to suggest that this established practice of mutual adjustment and cooperation on a constitutional question of inherent uncertainty[27] reflects mere "political convenience rather than constitutional commitment." Tribe Prepared Statement at 300. None of the three political branches involved in working out the procedure for Congressional-Executive agreements has abdicated its constitutional responsibility; none has endangered the basic, structural provisions of Articles I and II.

Finally, Professor Tribe's newly-crafted account of the treaty power entails that the Federal Government may diminish State sovereignty by employing the Treaty Clause to ratify an international agreement, but not by using any other constitu-

---

[26] Interestingly, in a footnote in his treatise, Professor Tribe writes that "the power of Congress to regulate commerce with Indian tribes has been rendered partly superfluous by the Supreme Court's extension of the treaty power to encompass federal treaties with Indian tribes " Laurence H Tribe, *American Constitutional Law* at 305 n.1 This description indicates that Professor Tribe believes (correctly, in our view) that the Indian Commerce Clause and the Treaty Clause overlap, and that either may be used as a source of legal authority for the Federal Government's dealings with the Indian tribes If so, then the Treaty Clause and the Foreign Commerce Clause ought equally to provide sources of authority for the United States's regulation of commerce with foreign nations

[27] It has long been recognized that Article II confers the treaty power "in general terms, without any description of the objects intended to be embraced by it." *Holmes v Jennison*, 39 U S. (14 Pet ) 540, 569 (1840) (plurality op ) More generally, "[o]ne cannot read the Constitution without being struck by its astonishing brevity regarding the allocation of foreign affairs authority among the branches . [T]he document grants clearly related powers to separate institutions, without ever specifying the relationship between those powers, as for example, with Congress's power to declare war and the president's power as commander-in-chief." Harold H. Koh, *The National Security Constitution* at 67

tional procedure for giving such an agreement effect. Basic to Professor Tribe's analysis is the assumption that *some* "set of intrusions on state sovereignty is sufficiently grave to trigger the requirements of the Treaty Clause." Tribe Prepared Statement at 307. On this view, the Federal Government is not constitutionally prohibited from curtailing State sovereignty to a certain degree, but it may not accomplish such a curtailment by the ordinary Article I process of legislation. We find that conclusion odd and unconvincing. If the Federal Government may not trespass on State sovereignty beyond certain limits, then the attempt to do so by making a treaty would not remove the constitutional infirmity: it is by now well-established that treaties may not violate basic constitutional ordinances, including the principles of federalism. *See, e.g., Reid v. Covert*, 354 U.S. 1 (1957); *see also* Laurence H. Tribe, *American Constitutional Law* at 228. On the other hand, if it *does* lie within the Federal Government's power to curtail State sovereignty under an international agreement, we see no reason why the Government may not invoke Article I procedures for giving effect to that agreement.[28] In short, if the Uruguay Round Agreements unduly invade State sovereignty, ratification as a treaty will not save them from unconstitutionality; if they are not an undue invasion, they can be given effect by Act of Congress.

## II. The Uruguay Round Agreements and Presidential Power

In considering Professor Tribe's critique of the Uruguay Round Agreements — which focuses on the asserted impairment that the agreement causes to State sovereignty[29]— it should be borne in mind that judicial decisions have treated GATT as effectively a "Treat[y]," and hence "supreme Law," within the meaning of the Supremacy Clause, U.S. Const. art. VI, § 2, and have held provisions of State law to be superseded by the GATT when in conflict with it.[30] It is also important to re-

---

[28] We do not think that *Missouri v. Holland*, 252 U S 416 (1920), establishes the contrary Language from Justice Holmes's opinion in that case has been taken to imply that treaties might limit State sovereignty in ways that Acts of Congress could not *Id* at 433. But the Court's later jurisprudence has undercut any such supposition. As Professor Tribe has written, "*Missouri v Holland* views the treaty power as a delegation of authority to federal treaty-makers independent of the delegations embodied in the enumeration of Congress' own powers. The decision thus sanctions a legal regime wherein certain subjects may be exclusively within the ambit of the states with respect to domestic legislation, but not with respect to international agreements and laws enacted by Congress pursuant thereto The importance of treaties as independent sources of congressional power has waned substantially in the years since *Missouri v Holland*, however, the Supreme Court in the intervening period has so broadened the scope of Congress' constitutionally enumerated powers as to provide *ample basis for most imaginable legislative enactments quite apart from the treaty power*." Laurence H. Tribe, *American Constitutional Law* at 227 (emphasis added)

[29] *See, e g*, Tribe Prepared Statement at 302.

[30] *See Inter-Maritime Forwarding Co. v United States*, 192 F Supp 631, 637 (Cust Ct 1961), *Baldwin-Lima-Hamilton Corp. v Superior Court*, 208 Cal App.2d 803, 819-20, 25 Cal Rptr. 798 (1962), *Territory v. Ho*, 41 Haw 565, 568 (1957), *see also Bethlehem Steel Corp v Board of Comm'rs of Dep't of Water & Power*, 276 Cal App 2d 221, 80 Cal Rptr 800, 804 n 9 (1969) (finding it unnecessary "to delve into an extensive analysis of the effect of GATT" on State law because federal power to conduct foreign trade policy "is exclusive in this field"), *K S B Tech. Sales Corp. v North Jersey Dist Water Supply Comm'n*, 381 A.2d 774, 778 (N J 1977) ("[t]he legal significance of GATT has been considered by all parties as equivalent to

member that the existing GATT arrangements include dispute resolution proce-
dures, which often involve referring disputes to panels of individuals, who act in an
individual and not a governmental capacity.[31] Professor Tribe does not contend
that the existing version of GATT or the dispute resolution procedures that have
developed under it are unconstitutional as applied to the Federal or State govern-
ments of this country; rather, he alleges that "[t]he Uruguay Round's establishment
of the World Trade Organization [the WTO] and its dispute resolution mechanisms
represents a [constitutionally] significant departure from prior versions of
GATT."[32] Specifically, Professor Tribe objects that if the WTO's dispute settle-
ment body (or an Appellate Body on appeal) were "to find a United States law
'GATT-illegal,' the United States would be bound by that decision unless it could
persuade the *entire GATT membership* by consensus to overturn the adverse deci-
sion. . . . Unlike other WTO decisions under the Uruguay Round, dispute panel
decisions, or Appellate Body decisions in the instance of an appealed case, would
be final, unless every WTO Member nation agrees to reject the panel or Appellate
Body's recommendation. . . . This 'reverse consensus' requirement is a 180-degree
turnaround from prior GATT practice; it means that individual nations, including
the United States, no longer maintain a de facto veto over GATT dispute panel
decisions. This turnaround . . . is alone sufficient to distinguish the Uruguay
Round's potential effects on state sovereignty from the effects of all previous
GATT agreements."[33]

Under existing GATT practice, "the Contracting Parties, acting jointly as a
whole, have jurisdiction over the final disposition of the dispute procedure."[34]
Although decisions on adoption of panel reports have always been made by con-
sensus, the existing GATT permits a vote on these matters. Thus, while the United
States, in practice, can exercise a "veto" over any adverse panel decision, this
could be changed under existing GATT rules. The Uruguay Round Agreements

---

that of a treaty . . In the context of this litigation we do likewise"), *appeal dismissed*, 435 U.S. 982 (1978);
*Delta Chem. Corp v. Ocean County Utils Auth.*, 554 A.2d 1381, 1384 (N.J 1988) (GATT exception ap-
plied to sewerage facilities products purchased by county), *aff'd in part and rev'd in part*, 594 A 2d 1343
(N.J 1991); *Armstrong v. Taxation Div Director*, 5 N J Tax 117, 133 (1983) ("[a]ssuming that the states
are bound by the provisions of GATT, imposition of the New Jersey sales and use tax on sales of gold coins
and gold and silver bullion does not discriminate against sales of products of a signatory nation"), *aff'd*, 6
N.J. Tax 447 (1984), 40 Cal Att'y Gen 65 (1962), 36 Cal. Att'y Gen 147, 149 (1960); 34 Cal. Att'y Gen.
302, 304-05 (1959), *but see American Inst for Imported Steel, Inc. v. County of Erie*, 58 Misc 2d 1059, 297
N Y S 2d 602, 607 (1968) (certain GATT provisions did not appear "in and of themselves [to] supersede
local legislation"), *rev'd*, 32 A.D.2d 231, 302 N.Y.S.2d 61 (N.Y A D. 1969). *See generally* John H Jackson,
*The General Agreement on Tariffs and Trade in United States Domestic Law*, 66 Mich L Rev 249, 280-89
(1967) (GATT has domestic legal effect in the United States insofar as it is Presidentially proclaimed), *id* at
297-311 (GATT is directly applicable to state and local governments in the United States and supersedes
conflicting state or local law)

[31] *See* John H. Jackson, *GATT as an Instrument for the Settlement of Trade Disputes*, 1967 Proc. Am.
Soc'y Int'l L. 144, 147-48, 151.

[32] Tribe Prepared Statement at 302

[33] *Id.* at 303-04.

[34] John H Jackson, *GATT as an Instrument for the Settlement of Trade Disputes*, 1967 Proc Am Soc'y
Int'l L. at 149

would alter this procedure by making the panel's or Appellate Body's report final unless the WTO States "decide[] by consensus not to adopt the [panel or] Appellate Body report" within a set period.[35] Professor Tribe appears to take this procedural alteration — the loss of the *de facto* "veto" — as constitutionally decisive. When one asks why that should be so, it appears that his answer is that under the new dispute resolution process, "states to a significant degree will be forced to place their fates under the Uruguay Round in the hands of the Executive Branch, which may have incentives counter to those of particular states in the context of particular disputes . . . . [T]he Executive Branch, not Congress, . . . would determine the fate of *state* laws found to be in violation of GATT. If a state chose not to alter a measure found by the WTO to be GATT-illegal, the United States Trade Representative could choose to bring an action against the state in a federal court, *see* S. 2467, 103d Cong., 2d Sess. § 102(b)(2) (1994) . . . — even if Congress had chosen to allow the state's measure to remain in effect and to accept trade sanctions on behalf of the entire nation rather than preempt the offending state law."[36]

We do not understand why Professor Tribe finds constitutional significance in the Uruguay Round's "reverse consensus" requirement. Under the *current* version of GATT, the States could equally well be said to be "in the hands of the Executive," for the simple reason that the President, as the sole constitutional actor who may represent the United States abroad, alone speaks for the United States in the GATT organization. Thus, the *President*, through his delegate, possesses the "veto" over the outcome of a dispute resolution under existing GATT practice, *and may refuse to exercise it*.[37] In other words, State laws may, even under the current version of GATT, be finally determined to be "GATT-illegal" unless the executive branch takes affirmative action to prevent that result.[38]

Moreover, it is misleading to suggest that the WTO procedures of the Uruguay Round Agreements place State law "at the mercy of the Executive Branch and the Trade Representative."[39] As Professor Tribe himself explains, even if the executive branch decides to bring an action against a State for the purpose of having a State law declared invalid for inconsistency with the Uruguay Round Agreements, the implementing legislation explicitly precludes the WTO panel's (or Appellate Body's) report from being considered "binding or otherwise accorded deference"

---

[35] Agreement Establishing The World Trade Organization, Annex 2, Understanding on Rules and Procedures Governing the Settlement of Disputes, Art 17 14, 33 I L M 9, 124 (1994) We note that voting is precluded under the new procedures.

[36] Tribe Prepared Statement at 303-04 Actually, the Attorney General, not the Trade Representative, would bring any such suit

[37] This is not to say that the Uruguay Round Agreements would not provide the President with different *incentives* from those that exist under the current GATT arrangements. But the point remains that even under existing arrangements, it would require Executive action to forestall a GATT finding that a State law was inconsistent with this country's commitments under the pact

[38] We note also that the possibility that State laws may be held invalid because they conflict with the provisions of GATT is nothing novel in itself, as discussed above, the courts (including State courts) have held that State law cannot be applied if it is inconsistent with the current version of GATT.

[39] Tribe Prepared Statement at 305

by the court that hears the case. *See* S. 2467, § 102(b)(2)(B)(i). Thus, the State law cannot be declared invalid by the executive branch acting unilaterally, even if the executive is armed with a WTO report that has found the State law GATT-illegal; rather, the independent action of another branch of the government — the courts — is required.[40]

Furthermore, given the breadth of the joint authority of Congress and the President in the field of foreign relations, it would be the truly extraordinary case indeed in which Presidential action in that area, when supported by an Act of Congress, could amount to an unconstitutional invasion of State sovereignty. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 635 (Jackson, J., concurring) (Presidential power in such cases is "at its maximum"). The Supreme Court has held that even *unilateral* Executive action, relying on the President's inherent constitutional powers alone, may constitute a "treaty" for purposes of the Supremacy Clause, and hence supersede contrary State law. Thus, in *United States v. Belmont*, 301 U.S. 324, 331-32 (1937), the Court upheld a unilateral Executive agreement in the face of contrary State law, declaring that

> complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states. . . . In respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear. As to such purposes the State of New York does not exist. Within the field of its powers, whatever the United States rightfully undertakes, it necessarily has warrant to consummate.

In *United States v. Pink*, 315 U.S. 203, 233 (1942), the Court, again upholding a unilateral Executive agreement over State law, reaffirmed that "[p]ower over external affairs is not shared by the States; it is vested in the national government

---

[40] Professor Tribe acknowledges that the detailed scheme of the implementing legislation, which is designed to make recourse to the courts unlikely, "offers a noteworthy protection to states." Tribe Prepared Statement at 305 The implementing legislation would set up a Federal-State consultation process to keep the States informed of Uruguay Round Agreements matters that would affect them. The States are to be notified by the United States Trade Representative of actions by foreign WTO members that might draw their laws into the WTO dispute resolution process, consulted regarding the matter, and involved in the development of this country's position if the matter is taken up in the dispute resolution process. Should the WTO find a State law to be GATT-illegal, the Trade Representative must consult with the State concerned in an effort to develop a mutually agreed response. *See* S 2467, § 102(b)(1) In short, the States are to be continuously and closely involved with the Executive in any matter that may involve a challenge to State law under the Uruguay Round Agreements.

The implementing legislation provides other important protections to State law No plaintiffs other than the executive branch may challenge a State law for inconsistency with the Uruguay Round Agreements, and in any action it brings, the Executive bears the burden of proof. Before bringing any such action, moreover, the executive branch must report to, and consult with, congressional committees in both Houses *See* S 2467, § 102(b)(2). Here again, as in the WTO phase of any challenge to State law, the political branches must take account of the State's views.

exclusively. It need not be so exercised as to conform to state laws or state policies, whether they be expressed in constitutions, statutes, or judicial decrees." Again, in *Zschernig v. Miller*, 389 U.S. 429, 432, 434 (1968), the Court struck down a State probate statute requiring an inquiry into "the type of governments that obtain in particular foreign nations" as "an intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." And in *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941), the Court stated that the field of international relations is "the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority." *See also United States v. California*, 332 U.S. 19, 35 (1947) ("peace and world commerce are the paramount responsibilities of the nation, rather than an individual state"); *The Chinese Exclusion Case*, 130 U.S. 581, 606 (1889) ("[f]or local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power"); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) (the Federal Government "has the power to regulate commerce with foreign nations: the responsibility for the character of those regulations, and for the manner of their execution, belongs solely to the national government. If it be otherwise, a single State can, at her pleasure, embroil us in disastrous quarrels with other nations."); *Holmes v. Jennison*, 39 U.S. (14 Pet.) at 570 (plurality op.) ("[a]ll the powers which relate to our foreign intercourse are confided to the general government"); *cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 424 (1964) (problems posed by "act of state" doctrine implicate foreign relations and thus "are uniquely federal in nature"); *Goldwater v. Carter*, 444 U.S. at 1005, n.2 (Rehnquist, J., concurring in the judgment) (State courts may not "trench upon exclusively federal questions of foreign policy").[41]

Accordingly, we cannot agree that the powers assigned to the President by the Uruguay Round Agreements and their implementing legislation would be unconstitutional (unless the agreement were ratified as a treaty) because they might be exercised in a manner that persuaded the courts to rule that State laws were superseded. Against the massive powers of Congress and the President, acting together, to control the Nation's foreign policy and commerce, the claims of State sovereignty have little force.[42]

---

[41] Decisions such as these place wholly beyond doubt the "general constitutional principle that, whatever the division of foreign policy responsibility within the national government, *all* such responsibility is reposed at the national level rather than dispersed among the states and localities. . . It follows that all state action, whether or not consistent with current federal foreign policy, that distorts the allocation of responsibility to the national government for the conduct of American diplomacy is void as an unconstitutional infringement upon an exclusively federal sphere of responsibility." Laurence H. Tribe, *American Constitutional Law* at 230.

[42] In the context of domestic legislation that assertedly threatens to impair State sovereignty, the Court has held that "States must find their protection . . through the national political process." *South Carolina v. Baker*, 485 U S 505, 512 (1988) If that is the case when Congress acts under the Interstate Commerce Clause, the States procedural rights in the national legislature can hardly be more extensive when the *Foreign* Commerce Clause is the source of Congress's authority See, e g., *Bethlehem Steel Corp v Board of*

## III. The World Trade Organization

Professor Tribe has also argued that the Uruguay Round Agreements must be ratified as a treaty because its WTO dispute settlement procedures undermines State sovereignty *directly*, rather than by vesting the power to do so in the President. Unfortunately, Professor Tribe's description of the WTO's powers, scope and functions is mistaken.[43] The proposed arrangements for the WTO do *not* represent an invasion of State sovereignty that can be cured only if the Uruguay Round Agreements are ratified as a treaty; rather, the Uruguay Round Agreements are similar in kind to earlier, Congressionally-approved trade pacts, including NAFTA and the Tokyo Round Codes, that were not, and that did not have to be, ratified as treaties.[44]

In Professor Tribe's view, the "basic thrust" of the Uruguay Round Agreements is "that it would empower international tribunals effectively to override state laws."[45] Hence, he argues, approval by two-thirds of the Senators present is required, because "[t]he Senate . . . remains the principal body in which the States *qua* States are represented in our National Government."[46] However, as the court has recently found in *Public Citizen v. Kantor*, 864 F. Supp. 208, 214 (D.D.C. 1994),

---

*Comm'rs of Dep't of Water & Power*, 80 Cal Rptr. at 803, 804 ("[t]he California Buy American Act, in effectively placing an embargo on foreign products, amounts to a usurpation by this state of the power of the federal government to conduct foreign trade policy . . . Only the federal government can fix the rules of fair competition when such competition is on an international basis. Foreign trade is properly a subject of national concern, not state regulation. . A state law may not stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'") (quoting *Hines v Davidowitz*, 312 U S at 67).

[43] *See generally* Letter for Professor Laurence H Tribe from Ambassador Michael Kantor, U S Trade Representative (Oct 14, 1994)

[44] *See, e g*, 19 U.S.C § 2503

[45] Tribe Letter at 2; *see also id.* at 3 (an Act of Congress implementing the Uruguay Round Agreements would "delegat[e] to an international body such as a WTO tribunal the power effectively to override a state tax or regulation").

[46] *Id.* at 2 We do not dispute that, at least at the time of the Framing, the Senate's role in the treaty-making process was seen as protecting the States, and especially the smaller States vis-à-vis the larger ones. *See* OLC GATT Memorandum at 6 n.11 It is open to question, however, whether the Senate was vested with a share in the treaty-making power only, or even primarily, because of the ties between the Senate and the States. The Framers appear to have thought that the Senate would function as a kind of council of advisers to the President on foreign policy matters, and accordingly stressed characteristics of the Senate such as the smallness of its numbers, the relatively long tenure of its members, and the insulation of Senators from the popular electorate, in justifying its role in the treaty-making process *See The Federalist* No. 75 (Alexander Hamilton); No. 64 (John Jay), *see also* Griffin B. Bell & H Miles Foy, *The President, the Congress, and the Panama Canal An Essay on the Powers of the Executive and Legislative Branches in the Field of Foreign Affairs*, 16 Ga. J. Int'l & Comp. L at 624-25 In any event, the Senate would not be *excluded* from the process by which the Uruguay Round Agreements are approved and implemented, on the contrary, it is obvious that Senate passage is necessary for the implementing legislation to become law.

Furthermore, "[i]t has never been doubted that representatives in Congress . represented the entire people of the State acting in their sovereign capacity " *McPherson v Blacker*, 146 U.S 1, 26 (1892) Thus, the House, as well as the Senate, provides the States with a forum in which their distinctive interests can be protected.

246

the resolution mechanisms contained in the [Uruguay Round] trade agreement permit disputes to be settled without altering domestic law. If a domestic law is found to violate the agreement, the defending party may implement the decision, negotiate a solution, or pay compensation.

Neither the WTO, nor any dispute settlement panels, will have the authority to enter injunctions or impose monetary sanctions against member countries. Nor will they be able to order any member country that has a federal system to change its component governments' laws. While a WTO dispute settlement may opine on whether a law is inconsistent with a member's obligations under the Uruguay Round Agreements, it is up to the parties to decide how to resolve the situation. The complaining country may suspend reciprocal trade concessions if alternative forms of settlement — e.g., compensation in the form of additional trade concessions, or a change in the defending country's domestic law — are not made. The suspension of trade concessions by a complaining country is likely to mean a temporary increase in the tariffs it imposes on the defending country's goods. No suspension of trade concessions can exceed the amount of the trade injury. Because our foreign trading partners would be able to increase tariffs on American goods even more easily in the absence of a trade agreement, it is hard to see how the attempt in the Uruguay Round Agreements to resolve trade disputes between member countries and to prevent the unilateral imposition of retaliatory tariffs could amount to an unconstitutional invasion of State or local sovereignty.[47]

Professor Tribe objects that it is "no answer that the United States might choose to pay whatever fine is levied by the WTO rather than sacrifice the sovereignty of one of the fifty States, for that makes each State's sovereignty a hostage to the Federal Government's willingness to impose a tax burden on the Nation as a whole. It also puts each State in the dilemma of either accepting the tax burden on its citizens entailed by having the United States pay a WTO fine, or protecting its citizens from that burden by lobbying against the fine and urging instead that the offending State be brought to heel."[48] Setting apart the factual error of assuming that the WTO has the power to "lev[y]" a "fine," Professor Tribe's argument buries the critical point that it is only *the United States*, not the WTO, that would wield the power to limit or displace State law.[49] Even if United States participation in the

---

[47] We have explained in some detail how the WTO procedure works in the OLC GATT Memorandum, at 7-8 Furthermore, NAFTA, like the Uruguay Round Agreements, built in the possibility that State laws and regulations might be challenged before international panels in dispute resolution proceedings for inconsistency with the United States's obligations under the trade pact, and that a complaining country that prevailed before a panel was entitled to suspend trade concessions *See id* at 2 In light of that history, we fail to understand how Professor Tribe would distinguish the Uruguay Round Agreements from NAFTA or the United States-Canada Free Trade Agreement.

[48] Tribe Letter at 2.

[49] Such displacement of State law, if accomplished by the legal action of the Federal Government, would require either an Act of Congress, or in the alternative a judicial decision in a law suit brought by the execu-

WTO's dispute resolution procedure might create incentives that would otherwise not exist to set aside some State laws, Congress can certainly structure the range of its future choices in a way that tends to have that effect.[50] There is in such a decision no "meaningful shift of control over state sovereignty to foreign tribunals."[51]

## Conclusion

We remain persuaded that, in deciding not to submit the Uruguay Round Agreements to the Senate for the concurrence of two-thirds of the Senators present, the President is acting in a wholly proper and constitutional manner. Like other recent trade agreements, including NAFTA, the United States-Canada Free Trade Agreement, the United States-Israel Free Trade Agreement and the Tokyo Round Agreement, the Uruguay Round Agreements may constitutionally be executed by the President and approved and implemented by Act of Congress.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

---

tive branch. In either case, State law would normally be superseded only if two branches of the national government (the President and Congress, or the President and the Federal courts) acted together.

[50] This is true even assuming that "[u]nder the Uruguay Round, a new dynamic would characterize relations between states and foreign nations and between states and the federal government." Tribe Prepared Statement at 307.

[51] Tribe Letter at 2.